DRAEGER SHIPPING CO. *v.* UNITED STATES (No. 2871)[1]

---

[1] T. D. 42234.

United States Court of Customs Appeals, May 27, 1927

*Allan R. Brown* for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*Fred J. Carter*, special attorney, of counsel), for the United States.

[Oral argument May 11, 1927, by Mr. Brown and Mr. Carter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

SMITH, Judge, delivered the opinion of the court:

Fur plates made of kidskins, imported at the port of New York, were classified by the collector as manufactures of furs further advanced than dyeing or dressing and prepared for use as material. The goods were accordingly assessed for duty at 40 per centum ad valorem under that part of paragraph 1420 of the Tariff Act of 1922 which reads as follows:

1420. * * * manufactures of furs, excepting silver or black fox, further advanced than dressing and dyeing, prepared for use as material, joined, or sewed together, including plates, linings, and crosses, except plates and mats of dog and goat skins * * * 40 per centum ad valorem.

The importer protested that the plates of kidskins were goatskin plates and that they were not subject to the operation of that part of paragraph 1420 under which they were classified and assessed for duty. The protest claimed among other things that the plates were either plates of goatskins dutiable at 10 per centum ad valorem under paragraph 1420 or nonenumerated manufactured articles dutiable at 20 per centum ad valorem under paragraph 1459. The parts of paragraph 1420 and paragraph 1459 upon which the protest was based read as follows:

1420. * * * plates and mats of dog and goat skins, 10 per centum ad valorem.

1459. That there shall be levied, collected, and paid * * * on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The Board of General Appraisers, now the United States Customs Court, held that the goods were dutiable at 10 per centum ad valorem as plates of goatskins and sustained the protest made by the importer on that ground. The Government thereupon filed a petition in

which it prayed for a rehearing on the ground that the decision of the Board of General Appraisers was in conflict with other decisions rendered by that tribunal and upon the further ground that another case involving the same question was pending on appeal to the United States Court of Customs Appeals. The Board of General Appraisers granted a rehearing.

On the rehearing the Government asked leave to submit further evidence, and was permitted to do so by the board.

### TESTIMONY FOR THE GOVERNMENT ON REHEARING

Henry Harriss, called as a witness on behalf of the Government, testified that he had been in the wholesale fur business 28 or 29 years and that he handled goatskins, kidskin plates, goatskin plates and kidskin crosses; that in September, 1922, he was selling such merchandise at wholesale and retail in the United States, mostly in the local markets; that he met buyers from St. Louis and a few more localities in the United States; that St. Louis is one of the fur markets of the United States; that there is a *commercial distinction* between kidskins and goatskins; that goatskins have long, shaggy hair and that kidskins are more or less a little bit flatter; *that there is no trade understanding of the term "plates of goatskins;" that the witness never heard the term "plates of goatskins" used in the trade; that the witness had no knowledge of the term "plates of goatskins;"* that goatskins are not made in plates but were used to be made in robes years ago; that a robe is much larger than a plate; that goatskins are not made in mats; that a mat is about 3 feet in length; that kidskin plates are never sold as plates of goatskins, but are sold as kidskin plates, and were so sold immediately prior to the Tariff Act of 1922; *that kidskin plates are made of skins of young goats.*

Israel Gottlieb testified for the Government that he was engaged in the business of buying and selling at wholesale kidskins, goatskins, and kidskin plates, mostly in New York City, and that he met buyers from all over the country; that kidskins and goatskins were bought and sold in the trade and that an order for kidskins would not be properly filled by a delivery of goatskins; *that the trade recognized an article known as "plates of goatskins" and that that designation was used in the trade.* On cross-examination Gottlieb *admitted that in the trade there was nothing which could be called "plates of goatskins" except plates made out of young goatskins.* On redirect examination Gottlieb stated that he had seen plates made out of goatskins; *that in the trade kidskins are the skins of young goats;* that a moufflon is a goat, and that its skin is known as a "moufflon;" *that a kid is a young goat and that its skin would be called a kidskin just as the skin of a moufflon would be called a moufflon; that kidskins, moufflons, and goatskins are all skins taken from the goat species.*

George R. Griswold testified on behalf of the Government that he was a wholesale dealer in kidskins, goatskins, and kidskin crosses; that his sales of such articles were confined to New York City and that he met no buyers coming from a different part of the country; that according to his experience kidskins meant Chinese kidskins; that goatskins referred particularly to China goatskins; that he could not tell whether he could distinguish between a goatskin and a kidskin; that he would say that a goatskin was excluded from the trade term "kidskin" and that a kidskin would be excluded from the term "goatskin." On cross-examination Griswold stated that kid and goat skins were sewed into crosses and that the word *"plate" was not applied to Chinese materials made of kid and goat skins*; that in the trade there was a dividing line between kidskins and goatskins and that a kidskin would not be sold to a furrier as a goatskin; that whether a skin was a kidskin or a goatskin was determined by the size of the skin; that a kid is a young goat and "if it gets big enough it is hard to tell;" that kidskins, goatskins, and moufflons are segregated in trade and in trade parlance *and each is a variety of goatskin fur.*

Daniel Collyer, jr., testified that his firm auctioned raw furs; that he did not know whether there was any trade understanding general and definite but that he did distinguish between goat and kid skins; *that skins listed as kidskins and goatskins did not indicate the name under which the skins would ultimately be sold in the trade.*

Samuel Gluck testified on behalf of the United States that an order for kidskins would not be properly filled by a delivery of goatskins; that a kidskin could not be included in the term "goatskins," because a goatskin had a longer-haired fur and came from an animal bigger than a kid; *that in the trade a kidskin meant the skin of a young goat and that a kidskin has a short fur which is not as coarse as that of a goatskin;* that he would not accept kidskins on an order for goatskins or goatskins on an order for kidskins; that he could tell the difference between a goatskin and a kidskin because the latter is lighter in weight, shorter in fur, and smaller than a goatskin. On cross-examination the witness testified *that large-sized kidskins were used in making "goat plates;" that the term used in the trade is "kid plates" and not "kidskin plates;" that the term "kidskin plates" is used in relation to plates made from goatskins; that he bought goat plates from China, and that the term used in the trade was "goat plates" and not "goatskin plates;"* that in goat plates bought by him there was a percentage of large-size kidskins; that prior to September, 1922, there was no such thing as a kidskin plate made of the skin of the young goat, and that prior to that date kidskin plates were made of the skin of the lamb of the caracul; that he never heard of "goat robes" in the trade, but that it was used by department stores; *that*

*he never heard of "plates of goatskins," and that the term used in the* trade was "goat plates." On redirect examination the witness stated that prior to September, 1922, there were two kinds of kidskin plates, one made of lamb and *the other made of goatskins,* and that those plates were distinguished in the trade from goatskin plates; that goat plates and goatskin plates were both used in the trade prior to 1922; that a goat plate would be a plate in length of about 40 inches or 42 inches by 22 or 24 inches in width and that a goatskin plate would be more of a cross; *that a plate made from the skin of an animal of the goat family would be called a goatskin cross; that a plate made from the skin of an animal of the goat family was known as a goat plate or goatskin plate and that it covered all plates made from the skin of an animal of the goat family;* that lamb crosses were not known as kid crosses but as caracul crosses; that he did not mean to say that a plate made altogether of kidskins would be known as a goat plate. On recross-examination Gluck declared that he did not agree with the witnesses who stated that there was no such thing as a goatskin plate in the trade; *that kidskins were used in making goatskin plates to fill in the sides;* that the general rule was that 10 per centum of big skins could be put into the goat plate and that 10 per centum of flat goatskins could be put into the kid plate.

Jack W. Polly testified for the Government that his firm was engaged in the business of importing furs from China and selling them on commission; that his firm sold only to New York firms; that kidskins were wavy or curly and that a goatskin has hair that is straight and more bushy than a kidskin; that his firm never handled plates made of goatskins but that it did deal in kid crosses. On cross-examination, the witness stated that there were various kinds of goatskins; some of them were known as China goatskins and some as moufflons; that kidskins were skins of a young goat and *were one kind of goatskin;* that he had never heard the term "goatskin plate" used in the trade; that he did distinguish between a cross and a plate; that even full-grown crosses would be called crosses in the trade; that the merchandise would be called by some merchants kid crosses and by others goat crosses.

Nathan Berlin, a witness for the Government, testified that he was a wholesale dealer in kidskins and goatskins and *that there was a distinction in the trade between kidskins and goatskins.* On cross-examination the witness admitted that *the distinction drawn by him between kid and goat skins applied only to the skins of Chinese kids and goats and did not apply to goat and kid skins from any other part of the world;* that very often buyers and sellers differed as to whether a skin was a goatskin or a kidskin; *that as a matter of fact a kidskin is nothing more than a kind of goatskin;* that there are various kinds of goatskins some of which are known as moufflons, some as China

kidskins and some as China goatskins; that puppyskins and dog-skins are both recognized as dogskins.

Bernard Weitzer testified for the Government that he was a dealer in furs and skins and bought and sold at wholesale goatskins and kid-skins principally in New York, St. Louis, and Boston, and that he met buyers of such skins from other places; that New York handled 90 per centum of the skin business in his opinion; that kidskins were comparatively small in size with silky and rather short hair; that goatskins were comparatively heavy, of a larger size with hair that is longer and coarser than that of the kidskin; *that there is a well-recognized distinction between kidskins and goatskins;* that a kidskin plate is a number of kidskins sewed together and is oblong in shape. On cross-examination the witness stated that a moufflon was a goat-skin; *that the trade meaning of the term "goatskin" does not differ from the ordinary meaning.* At this point the witness was shown a skin and asked whether it was the skin of a kid or a goat, to which he replied that he did not know.

### TESTIMONY FOR THE IMPORTER ON REHEARING

Alfred Sack, called for the importer, testified that his firm was engaged in importing and selling at wholesale; that his business was buying and selling goatskin furs and skins; *that in the trade the term "goatskins" meant goatskins, kidskins, goatskin crosses or plates, moufflons and German zickels, which are plates made out of young goat or kid skins.* On cross-examination the witness stated that the skin of a full-grown goat would not be a kidskin; that there is recognized in the trade a variety of goatskins, *and that kidskins, moufflons, and full-grown goatskins are goatskins* and that by that he meant all of those skins were understood in the trade to come from the goat family.

Harold J. Stephens, a witness for the importer, stated that he was an importer of Chinese furs; that he sold such furs at whole-sale in New York, the middle West, and in the western part of the country; that the term "goatskins" is understood by the trade to cover Chinese goatskins, *but did not include kidskins or moufflons;* that such skins were known to the trade by their separate names; *that China goatskins and moufflons and kidskins were recognized as varieties of goatskins throughout the country.* On cross-examination Stephens stated that when skins were ordered the order had to specify the kind of skins that was wanted; that an order for China goatskins would be indefinite; that if an order was placed for kid-skins he would know what was wanted if the order specified the sort of kidskins desired; that there is a distinction between kid-skins and goatskins in the trade; that a kidskin would be a young short-haired skin and the "dividing line would be for each man to

use his own judgment;" that articles sold as goatskins have a heavy pelt, longer fur, and larger size than kidskins; *that merchants did not agree on the dividing line between kidskins and goatskins, but that the skin of a small kid could be readily distinguished from the skin of a full-grown goat;* that a large goatskin would not be a kidskin, *but that a large kidskin would be accepted at certain times as a goatskin; that a bale containing kidskins and goatskins would be regarded as a bale of goatskins;* that skins considered to be kidskins would in a broad way be excluded from goatskins.

William J. Hare, called on behalf of the importer, testified that he was an examiner of merchandise at the appraiser's stores in New York; that the goods imported were examined by him, were plates of kidskins, and were reported by him to be kidskins with the fur on further advanced than dressing and dyeing and sewed into plates.

A careful analysis of this testimony discloses that the witnesses for the Government and the importer were agreed that there was a distinction between kidskins and goatskins but the fact that they were so agreed does not establish commercial designation. The distinction shown by this testimony to exist in the trade is a distinction which is made by people in general and is based on the common meaning of the term "kidskin." Kidskin is the skin of the young goat and from that fact it necessarily follows that it could not very well be the skin of an old goat. A distinction between kidskins and goatskins is not one that is peculiar to the trade but is one made by everybody whether in the trade or out of it.

In order to establish commercial designation, it must be shown that the tariff designation *has a meaning in the trade different from its common meaning and from that ordinarily assigned to it by people in general.* In order to prove commercial designation it must be established that the trade meaning of a term used in a tariff law differs from the common meaning thereof and that the commercial meaning is definite, uniform, and general, and not partial, local, or personal. *Maddock* v. *Magone*, 152 U. S. 368, 371.

No attempt whatever was made to prove the trade understanding of the tariff designation "plates  *  *  *  of  *  *  *  goatskins." Indeed, Harriss, one of the witnesses for the Government, positively testified that there was no trade understanding of that designation. Of course, the Government had the right to prove that "goatskins" had a special meaning in the trade which did not include kidskins, but it failed to do so and it failed because the witnesses produced by it were not agreed that "goatskins" had a special meaning in the trade which differed from the common, ordinary meaning thereof. Some of the trade witnesses testified that kidskins were not goatskins, while others of equal experience and opportunity to know, declared that kidskins were skins of the young goat and that skins of the young

goat, skins of the old goat, and moufflons were all goatskins. Several of the witnesses admitted without reservation that merchants would differ as to whether a skin was a skin of a young goat or an old goat and that plates made of kidskins and goatskins would be regarded as plates of goatskins. One of those witnesses declared that a bale containing goatskins and kidskins would be accepted as a delivery of goatskins unless the order excluded kidskins. Griswold, a Government witness, testified positively that prior to September, 1922, there was no such thing in the trade as a kidskin plate made of the skin of the young goat and that kidskin plates prior to that date were made of the skin of the "lamb" of the caracul, which is not a goat but a Persian lynx. If that witness be correct, it is apparent that a plate of the skin of the young goat was something entirely different in the trade from that to which the other Government witnesses testified. Griswold said that a plate made from the skin of an animal of the goat family would be called a goatskin cross. He also testified that a plate made from the skin of such an animal was known as a goat plate or a goatskin plate and that the term "goat plate" or "goatskin plate" covered all plates made from the skin of an animal of the goat family. Polly, another Government witness, stated that as a matter of fact a kidskin is nothing more than a kind of goatskin. Weitzer testified for the Government that the trade meaning of the term "goatskin" does not differ from the ordinary meaning. As the ordinary meaning of the term "goatskin" includes both the skin of the old goat and the skin of the young goat, it is evident that his testimony did not support the Government's contention that in the trade plates of kidskin were not plates of goatskin.

On the evidence submitted, the United States Customs Court overruled the protest and expressly found that *while there was a trade distinction* between kidskins and goatskins there was no uniform, definite, or general meaning of the term "kidskin" different from the ordinary, common meaning thereof. Testimony as to a trade meaning different from the common meaning might possibly be corroborated by evidence of a trade distinction, but such evidence of itself is certainly not sufficient to establish commercial designation. Assuming that the United States Customs Court intended to find and did find that "goatskins" in the trade had a meaning different from the common meaning thereof and that that meaning excluded kidskins, we must hold that there is no evidence disclosed by the record to warrant such a finding and that no meaning of the designation "goatskins" different from its common meaning was proven.

In *Seward* v. *United States*, 9 Ct. Cust. Appls. 4, this court held on the evidence there presented by the record that in trade and commerce kidskins sewed into the form of crosses were not plates

and that kidskins were not goatskins. That case can not be regarded as determinative of the issue here involved inasmuch as the record there considered differs very substantially from that submitted to us in this case. In *Seward* v. *United States, supra,* the witnesses were in substantial agreement; in the controversy raised by this appeal the witnesses for the Government, taking no account of the witnesses for the importer, make it plain that there is no uniform, definite, or general trade meaning of the tariff term "goatskins." Judge Montgomery, who wrote the opinion in the *Seward* case, did say that there was a trade distinction between kidskins and goatskins, but, standing alone and without consideration of the evidence to which it was directed, that language can not be accepted as establishing the doctrine that evidence of a mere trade distinction is sufficient to prove a commercial meaning which excludes articles from a class term to which they are assigned by the common meaning thereof.

"Goatskins" is a general term which, as commonly understood, includes the skins of young as well as of old goats. The Government failed to prove that that term prior to the Tariff Act of 1922 had a meaning in trade and commerce different from its common meaning. As it is admitted by the Government that the goods are plates of kidskins and as kidskins are within the common meaning of the designation "goatskins" we must hold that the articles imported are plates of goatskins dutiable at 10 per centum ad valorem as claimed by the importer.

The judgment of the United States Customs Court is, therefore, reversed and the cause remanded.

*Reversed* and *remanded.*