(C. D. 1203)

KUNG CHEN FUR CORP. *v.* UNITED STATES

United States Customs Court, First Division

(Decided January 13, 1950)

*Barnes, Richardson & Colburn* and *Strauss & Hedges* (*Albert MacC. Barnes, Hadley S. King,* and *Eugene F. Blauvelt* of counsel); and *Siegel, Mandell & Davidson; John D. Rode; Lane, Young & Fox; Brooks & Brooks;* and *Lane & Wallace,* associate counsel, for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; MOLLISON, J., dissenting

OLIVER, Chief Judge: The merchandise before us consists of kidskin plates exported from China and entered at the port of New York. They were classified at 25 per centum ad valorem under paragraph 1519 (a), Tariff Act of 1930, as "* * * plates * * * of dressed * * * kid skins" and are claimed to be free of duty under the provisions of paragraph 1681, covering "Furs and fur skins, not specially provided for, undressed." Defendant alternatively contends that these plates, if not dutiable under paragraph 1519 (a), are properly dutiable at 20 per centum ad valorem under paragraph 1558 as nonenumerated manufactured articles, or under paragraph 1519 (e) as "Articles, wholly or partly manufactured * * * wholly or in chief value of fur, not specially provided for." Paragraphs 1519 (a), 1519 (e), 1558, and 1681 are herein set forth:

PAR. 1519. (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; all the foregoing, if dyed, 30 per centum ad valorem.

PAR. 1519. (e) Articles, wholly or partly manufactured (including fur collars, fur cuffs, and fur trimmings), wholly or in chief value of fur, not specially provided for, 50 per centum ad valorem.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

PAR. 1681. Furs and fur skins, not specially provided for, undressed.

This action presents, so far as we have been able to ascertain, the first instance where this court has had before it the question of the dutiable status of imported kidskin plates under the provisions of the Tariff Act of 1930.

The record covers over 2,000 pages of testimony, with some 42 exhibits. The case was also ably briefed by both litigants. It would be impractical to attempt to digest all the testimony in this opinion and in view of our decision it is unnecessary. Plaintiff introduced the testimony of 24 witnesses, including in their number: Importers and dealers, fur dressers and dyers, fur garment manufacturers, and Chinese shippers. Their testimony was introduced in support of plaintiff's contentions that:

1. The China process to which the kidskins in the imported plates were subjected was not a dressing process.

2. Kidskins so processed were not dressed within the meaning of that term as used in the domestic market.

3. The imported plates had to be further processed before dyeing.

4. The imported kidskin plates were not used in the form in which imported but were cut apart and rematched for hair quality.

5. The so-called Chinese dressing or processing used on the kidskins in these plates was the same in all material respects as that used in processing the dogskins in *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. 441, T. D. 48902; *United States* v. *Arnhold & Co., Inc., et al.*, 27 C. C. P. A. 135, C. A. D. 74; and the goatskins in *United States* v. *Winograd Bros., Inc.*, 32 C. C. P. A. 153, C. A. D. 302.

6. That the China process was solely for the purpose of preserving the plates in shipment and for ease of handling in buying and selling (R. 47, 262, 263, 388).

In support of the collector's classification the Government introduced the testimony of 13 witnesses, among them being fur examiners at the port of New York, fur garment manufacturers, and a former employee of a dressing and dyeing concern; also, a fur flesher, and 35 physical exhibits. It sought to establish:

1. That the so-called China processing was a dressing process.

2. That the skins in the imported plates were dressed.

3. That the China process did more than preserve.

4. That the plates were matched up in China, were capable of use, and were actually used in the form of plates in the manufacture of cheaper garments.

5. That if not dutiable under paragraph 1519 (a), they were properly dutiable either under paragraph 1519 (e) as manufactures of fur or under paragraph 1558 of the tariff act as articles manufactured, in whole or in part, not specially provided for.

It may be said generally that all of the witnesses were experienced and qualified. All of the witnesses for the plaintiff testified that the

plates here in question had to be further processed in this country before dyeing to make them ready for the manufacture of garments and that in the condition as imported the plates were not dressed. The Government's witnesses, on the other hand, maintained that the process which took place in China was a dressing process and that these plates were made up of dressed kidskins.

There is testimony in this record (R. 1455–8, 1548, 1562, 1630) that plates in the condition of illustrative exhibits 1–A to 1–F, that is to say, plates which have been China dressed or China processed (and the terms are used interchangeably) are dressed. It is conceded that they were first caged and drummed to remove excess flour and dirt (R. 1631, 1632, 1737). It is significant, however, that one of the Government's witnesses testified that while the plates in the condition as imported could be used in the manufacture of fur wearing apparel that actually this was not the practice (R. 1484). This witness further stated that commercially acceptable fur wearing apparel could not be made out of illustrative exhibit 1–A in its condition as imported (R. 1485).

Samples are potent witnesses (*United States* v. *Bernard Judae & Co.*, 18 C. C. P. A. 68, T. D. 44029; *United States* v. *The Halle Bros. Co.*, 20 C. C. P. A. 219, T. D. 45995; *United States* v. *Fred. Gretsch Mfg. Co., Inc.*, 28 C. C. P. A. 26, C. A. D. 120). We have before us as illustrative exhibits various plates, kidskins, portions of plates and skins, and what remains of a fur coat which had been ripped apart (defendant's illustrative exhibit 37), together with plates similar to the imported kidskin plates (plaintiff's illustrative exhibits 1–A to 1–F). Additional plates were added by the Government to complete what was claimed to be a complete line of hair design (defendant's illustrative exhibits 34, 35), together with a gray kidskin plate (defendant's illustrative exhibit 6), which was claimed by the defendant to be similar, except for color, to the imported plates. There is also a sample of a raw kidskin (illustrative exhibit 5). We also have a portion of a soft brown kidskin plate introduced by the Government and identified by plaintiff's witness Ohsman as a dressed and dyed kidskin plate (exhibit 20; R. 509). In Government's illustrative exhibit 9, a manual on furs, there appears a statement at page 3, question 5, "The best skins all come in raw. Skins of poorer quality come into this country in plates, and plates always come in dressed." It is our belief that by the term "dressed" the author is referring to the China dressing or China processing which produces a skin similar to those going into the kidskin plates before us.

It is clear from this record, and from a physical examination of the exhibits, that the samples of plates, and portions of plates (such as illustrative exhibit 10, exhibit 20, illustrative exhibit 28, collective illustrative exhibit 27–A and B) which have been further processed

and dyed after importation are softer and more pliable than the plates in the condition in which imported (illustrative exhibits 1-A to 1-F).

There was considerable testimony by plaintiff's witnesses that while nonputrescent, the imported plates in the condition in which imported, if wet, would tend to harden on drying, whereas such plates dressed, according to American standards, if wet, would not harden. Sample of a plate, which it was stated had been wet and which upon drying had hardened, was introduced by the plaintiff (plaintiff's illustrative exhibit 26; R. 726). The Government, on the other hand, introduced into evidence a sample plate (exhibit 42; R. 1989), claimed to have been wet and which upon drying did not become hard or parchment-like or similar to the sample (illustrative exhibit 26), which it was claimed was put through the same process. The Government also introduced in evidence illustrative exhibits 34 and 35, stated to be Chinese-processed kidskin plates. The witness stated that he had wet them by immersion in water and that he then examined them after they had dried and that "they were slightly stiffer than before they had been inserted, but just a light manipulation of the pelt and they were back to normal just the same as they were before" (R. 1563). Neither of these wetting experiments was conducted under court supervision or under any controls which would permit of proper comparison, and no request was made for any such experiment with any plates or portions of plates during the progress of the trial.

There is no question between the parties but that the articles before us are plates made up of kidskins. Paragraph 1519 (a) provides *eo nomine* for "plates * * * of dressed dog, goat, or kid skins." A plate is a rectangular-shaped article, measuring approximately 2 x 4 feet, made up of approximately nine kidskins, hand-sewn together by native labor in China, with the spaces between the skins filled in with smaller pieces of kidskin, so that the entire plate, as imported, if laid flat upon the skin or pelt side, would show a solid surface of fur or hair. The illustrative samples before us showing the general nature of the imported plates are graded and bought and sold under the hair design description, using such descriptive trade terms as "curly," "wavy," "galliacs," and "moire" (illustrative exhibits 1–A to 1–F, inclusive). The number of pieces entering into the formation of these plates varies from 34 in exhibit 1–E to 74 in exhibit 1–C.

The question of whether or not fur skins which had been subjected to the so-called "China dressing" or "China processing" were dressed, within the meaning of that term as used in paragraph 1519 (a) of the Tariff Act of 1930, has been fully considered and decided insofar as dogskins and goatskins are concerned. (*United States* v. *Rotberg & Krieger, supra*; *United States* v. *Arnhold & Co.* (dogskins), *supra*; *United States* v. *Winograd Bros.* (goatskins), *supra*.) In these cases our court of appeals has held that such "China dressing" or "China

processing" did not produce a dressed skin, as that term was used in paragraph 1519 (a), Tariff Act of 1930. Dogskins and goatskins so processed were held to be free of duty under the provision of paragraph 1681 as furs or fur skins, undressed. Kidskin plates were under consideration in *Draeger Shipping Co.* v. *United States*, 15 Ct. Cust. Appls. 190, T. D. 42234. The merchandise was there assessed as manufactures of fur under paragraph 1420, Tariff Act of 1922, which did not include the word "dressed" or the designation "kid skin" plates. This paragraph (1420 of the Tariff Act of 1922), the predecessor to the present paragraph 1519 (a), read as follows:

Furs dressed on the skin, excepting silver or black fox furs, not advanced further than dyeing, 25 per centum ad valorem; plates and mats of dog and goat skins, 10 per centum ad valorem; manufactures of furs, excepting silver or black fox, further advanced than dressing and dyeing, prepared for use as material, joined or sewed together, including plates, linings, and crosses, except plates and mats of dog and goat skins, and articles manufactured from fur, not specially provided for, 40 per centum ad valorem; silver or black fox skins, dressed or undressed, and manufactures thereof, not specially provided for, 50 per centum ad valorem; articles of wearing apparel of every description partly or wholly manufactured, composed wholly or in chief value of hides or skins of cattle of the bovine species, or of dog or goat skins, and not specially provided for, 15 per centum ad valorem; articles of wearing apparel of every description wholly or in part manufactured, composed wholly or in chief value of fur, not specially provided for, 50 per centum ad valorem.

The Court of Customs Appeals there held kidskin plates to be properly dutiable under the provision for goatskin plates.

As paragraph 1519 (a) of the Tariff Act of 1930 provides for "plates * * * of dressed * * * kid skins," the first question before us for determination is whether or not the kidskins which were sewn together to form the imported plates were or were not dressed. The skins in these plates are not raw (illustrative exhibit 5). There is no question but that the kidskins making up these plates had been subjected to treatment described as "China dressing" or "China processing" prior to being sewn into the form of the imported plates. From this record, we find the "China process," to which the kidskins in the plates before us were subjected in China, to be the same in all material respects as the process to which the dogskins in the *Rotberg & Krieger* and *Arnhold* cases, *supra*, and the goatskins in the *Winograd Bros.* case, *supra*, were subjected. That process, briefly, is as follows:

The raw kidskins were first soaked in water until soft; then they were scraped with a certain kind of knife to remove blood, dirt, and flesh from the under side of the skins. Following this, they were placed in vats, called "kongs," into which had been poured a solution consisting of water, millet flour, and sea salt. They remained in this solution from 3 to 7 days, depending upon temperature, type of skin, etc., during which time they were occasionally stirred. After

they were removed from the kongs they were hand-kneaded to soften them, and then they were permitted to dry, after which they were again softened by hand and then piled with a heavy weight on top to keep them flat. Following this, the skins were sorted according to the different types of hair character, after which groups of selected skins were laid out within a marked-out area or block which was the size and shape of the ultimate plates or mats. The rough edges and the bad pieces were trimmed off the skins, and if this resulted in an unfilled area in the marked-out block, other pieces would be fitted therein. Following this, the skins were sewn into the rectangular sheets of fur which are the plates in question.

In the *Rotberg & Krieger* case, *supra*, the Court of Customs and Patent Appeals said (p. 445):

> We regard it as being of small consequence that the merchandise may have been referred to in China as dressed dogskins, nor is it of particular importance under what name or names the skins were ordered. The question of what they actually are must be determined by United States trade standards.

The court further noted (p. 448) that the China process there used, "did not constitute a dressing process, and that the merchandise in the condition as imported was not dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra*."

In the *Winograd Bros.* case, *supra*, where the Court of Customs and Patent Appeals had before it the same question in connection with goatskins, it followed its decision in the *Rotberg & Krieger* and *Arnhold* cases, *supra*, which it referred to as involving "issues analogous to the basic issue here involved" (p. 155). In the case before us, we likewise find the issue to be analogous to the issue presented in the *Rotberg & Krieger*, *Arnhold*, and *Winograd* cases, *supra*, and for that reason are of opinion that our decision here must be controlled by the decisions in those cases.

The Congress in enacting paragraph 1519 (a) provided for "* * * plates * * * of dressed * * * kid skins." Nowhere in the act has it made provision for plates of undressed kidskins. Kidskin plates from China, so far as disclosed in this record, are always made from kidskins in the condition of those in the plates before us (illustrative exhibits 1–A to 1–F). There is nothing in this record by way of testimony or exhibits to indicate that any Chinese kidskins are ever dressed or processed in any other manner. The Court of Customs and Patent Appeals having held in the cases hereinbefore cited that skins which were "China dressed" or "China processed" were not dressed within the meaning of that term as used in paragraph 1519 (a), we are compelled to find the merchandise at bar to be plates of undressed kidskins. Therefore, not being made up of dressed kidskins, the imported plates are not dutiable as assessed under paragraph 1519 (a).

There is, therefore, presented to us the question of the proper classification of *undressed* kidskin plates. One of the Government's contentions is that these imported plates, if not dutiable as classified, are properly dutiable under paragraph 1519 (e) as "Articles, wholly or partly manufactured * * * wholly or in chief. value of fur, not specially provided for." We cannot agree with this contention. The Congress by providing in paragraph 1519 (a) for "* * * plates * * * crosses," etc., of kidskins has recognized that plates are a form or shape in which kidskins are sewn together before exportation. In paragraph 1519 (e) Congress, having already provided for fur skins in the form of plates in paragraph 1519 (a), proceeded to provide for manufactures of fur. To disregard the *eo nomine* provision for plates would be to go contrary to the expressed intent of Congress. In some of the earlier decisions of the Board of General Appraisers some reference was made to plates, holding them not to be manufactures of fur. The Board of General Appraisers, in T. D. 13180, decided July 15, 1892, held that certain rat skins, dressed and sewed together, to form plates about 4 feet square, were furs and not manufactures of fur under the Tariff Act of 1890. In so holding the board stated:

* * * An examination of these plates shows that they have undergone no process of manufacture other than dressing the skins and forming large-sized skins as it were from numerous small ones. The testimony taken by the Board tends to show that these plates are constructed for convenience in dyeing, and that after being dyed they are to be cut into strips and used as trimmings and for manufacturing purposes.

The kidskin plates before us likewise have undergone no process of manufacture. They are kidskins sewn together into the form of plates.

I find the imported kidskin plates not to be fur articles, wholly or partly manufactured, and, therefore, not dutiable under paragraph 1519 (e).

The defendant herein further contends that the imported merchandise is alternatively classifiable under paragraph 1558 of the Tariff Act of 1930 as "* * * articles manufactured, in whole or in part, not specially provided for."

Furs in all conditions are described in paragraph 1519 and paragraph 1681. If the plates in question are furs, they are enumerated, and if enumerated, they cannot fall under paragraph 1558. In the *Winograd Bros.* case, *supra*, our appellate court was of opinion that the provisions of paragraph 1519 (a) for "Dressed furs and dressed fur skins" and those of paragraph 1681 for "Furs and fur skins, not specially provided for, undressed" are more specific than those of paragraph 1558 for "all raw or unmanufactured articles not enumerated or provided for." We are of opinion that the basic issue here involved is whether the

kidskins in the plates before us were dressed or undressed, as provided for in paragraph 1519 (a), and that paragraph 1558 of the act has no application here.

We are satisfied from this record that these imported plates are undressed kidskins sewn together and should be free of duty under paragraph 1681 as claimed.

While paragraph 1681 provides for "Furs and fur skins, not specially provided for, undressed" and does not refer to "plates" by name, we find these plates to be a number of kidskins sewn together. As the dutiable status of the imported plates depends on whether the individual skins making up the plate are dressed and having concluded that they are not dressed, we hold the imported plates to be free of duty as "* * * fur skins * * * undressed," as claimed, under paragraph 1681, under the authority of the *Rotberg & Krieger, Arnhold & Co.*, and *Winograd Bros., Inc.*, cases, *supra*. The protests will, therefore, be sustained and judgment will issue accordingly.

### DISSENTING OPINION

MOLLISON, Judge:  I must respectfully dissent from the decision of the majority sustaining the plaintiff's protest claim for duty under paragraph 1681 of the Tariff Act of 1930. The majority considers as controlling the decisions in the *Rotberg & Krieger, Arnhold & Co.*, and *Winograd Bros., Inc.*, cases cited therein.

I have carefully examined the decisions in each of these cases, and conclude that they are in no way controlling of the issue herein. Those cases related to dog and goatskins which had been classified and assessed with duty under the general provision in paragraph 1519 (a) for "Dressed furs and dressed fur skins." The plates and mats at bar were classified and assessed under the provision for "plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins," and I am of the opinion that our inquiry is not limited to the question of the meaning Congress intended to be given to the term "dressed" but should extend to the class of goods that it intended should be embraced by the entire provision for "plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins." As has been so frequently said in this and other courts, "The master rule in the construction of statutes is to so interpret them as to carry out the legislative intent." *United States* v. *Clay Adams Co., Inc.*, 20 C. C. P. A. (Customs) 285, T. D. 46078. See also *Stoeger* v. *United States*, 15 Ct. Cust. Appls. 291, T. D. 42472; *Procter & Gamble Manufacturing Co.* v. *United States*, 19 C. C. P. A. (Customs) 415, T. D. 45578; *Hartranft* v. *Oliver*, 125 U. S. 525, 31 L. ed. 813; *United States* v. *Stone & Downer Co. et al.*, 274 U. S. 225; *United States* v. *Katz et al.*, 271 U. S. 354; and *United States et al.* v. *American Trucking Associations, Inc., et al.*, 310 U. S. 534.

In the ascertainment of the intention of the legislature in the enactment of the provision in question, I find the legislative history to be quite revealing. The tariff provision which preceded the one under which the merchandise at bar was classified appeared in paragraph 1420 of the Tariff Act of 1922 and read as follows:

* * * plates and mats of dog and goat skins, 10 per centum ad valorem * * *

and in *Draeger Shipping Co.* v. *United States*, 15 Ct. Cust. Appls. 190, T. D. 42234, kidskin plates were held to be classifiable under the foregoing provision for goatskin plates. It will be particularly noted that the word "dressed" did not appear in the 1922 act provision.

When the bill which ultimately became the Tariff Act of 1930 was under consideration by the Committee on Ways and Means of the House of Representatives, hearings were held at which interested parties might present their views. At that time there was presented to the committee a brief by the National Association of the .Fur Industry, stated to have been submitted on behalf of the National Association of the Fur Industry, the American Fur Merchants Association, the Fur Dressers and Fur Dyers Association, the Associated Fur Manufacturers (Inc.), the Fur Brokers Association, and the Rabbit & Sheep Skin Dressers Association. See p. 7366 *et seq.* of volume 14 of "Tariff Readjustment—1929, Hearings before the Committee on Ways and Means, House of Representatives, Seventieth Congress, Second Session."

In the said brief, the National Association of the Fur Industry, claiming to speak for the fur industry in all its branches (p. 7369), made a recommendation that the fur provisions of the Tariff Act of 1922 be amended to read in part, as follows:

Dressed furs and skins, excepting silver or black fox, including plates, mats, and crosses of dressed dog, goat, or kid skins, 25 per cent ad valorem.

Dyed furs and skins, excepting silver or black fox, including dyed plates, mats, and crosses of dog, goat, or kid skins, 35 per cent ad valorem.

As the basis for the recommendation the National Association of the Fur Industry submitted the following (pp. 7370–7371):

CHANGES NECESSARY FOR THE SAKE OF FAIRNESS AND REASON

There is no doubt that paragraph 1420 has, since it was given its present general form in 1913, become an absurdity, and is inequitable in some respects as well.

At that time (1913) a distinction was made between true furs and the skins of a group of domestic animals including Chinese dogs and goats, these skins being used principally for coats retailing at $12.50 to $17.50 and used by ranchers and teamsters in the northwest.

Dog and goat skins were at that time imported principally in the form of mats or plates; mats consisting of a single *dressed* skin with pieces added to make it regular in outline and oblong in form; plates consisting of two or more *dressed*

skins sewn together in an oblong form. Then as now this sewing was crude and had to be ripped out and resewn to meet our standards, but there is an advantage in importing the skins in this form, rather than separately, as they are uniform in size while individual skins are not.

*Plates, mats, and crosses of dog, goat, or kid skins are not further advanced than dressing and dyeing. They are not as far advanced as dyeing in fact.* They cannot be used for manufacturing purposes until the seams have been resewn, often after the skins have been completely ripped apart. In the case of crosses of goat and kid, which for ages past the Chinese have made in this form, the arms of the cross must be cut off and seams ripped out and resewn. Hence there is no reason whatever for regarding goat and kid crosses as "Further advanced than dyeing" and the duty on them as well as on dog, goat, and kid plates and mats should not be higher than that on dressed furs, if they are merely dressed, or than that on dyed furs if they are dressed and dyed. They are not ordinarily imported dyed.

ACTS OF 1913 AND 1922 PERMITTED IMPORTATION OF PLATES AND MATS OF DOG AND GOAT AT LOWER RATE THAN DRESSED SKINS

While fixing the tariff in 1913 on these mats and plates of *dressed* dog and goat skins and at 10 per cent as against 40 per cent for true furs dressed and partially manufactured, Congress made no exception of dog or goat skins dressed but not sewn together, but deliberately left such skins to come in as dressed furs at 30 per cent, though making no mention thereof in the act.

This was done in the interest of certain American dressers who were then dressing raw Chinese dog and goat skins, and were hopeful of eventually developing their methods and processes to a point at which they could compete on a quality basis in spite of higher cost of labor. It was felt that with sufficient encouragement these concerns would eventually develop a satisfactory method of dressing these skins.

It is greatly to be desired that such a process should be developed here as American dealers would willingly pay three or four times as much for dressing if they could have dogs, especially, dressed here, thereby avoiding a delay of several months in getting the goods on the market and also avoid the very high interest rates and risks attendant on tieing up capital in China for that length of time.

CUSTOMS RULINGS NULLIFY CONGRESSIONAL INTENT

The ink was hardly dry on the act of 1913 when the customs authorities ruled that Congress could not have intended *dressed* dog and goat skins to come in at 30 per cent and the same skins sewn together in mats or plates at only 10 per cent, hence *dressed* dog or goat, as individual skins should come in at the same rate specified for plates or mats.

The infant industry of dog and goat dressing was promptly deprived of the protection given it by Congress and has made no material progress since then.

CUSTOMS COURT RULING RESTORES PROTECTION ON DOG AND GOAT SKINS *DRESSED*, BUT UNDER THE IMPRESSION THAT CONGRESS DID NOT SAY WHAT IT MEANT

This protection was not restored until 1927 when the Customs Court rendered a decision that kid skins are entitled to the same tariff rate as goat skins, ruled that neither are entitled to 10 per cent, and that the Customs Bureau had erred in letting *dressed* dog and goat skins in during the past 13 years at 10 per cent. The court held that it could not put into the act a meaning not expressed in the language of the act, even though the resulting situation seemed absurd.

CONDITIONS CHANGE

In 1913 Congress had also provided 15 per cent for garments made of dog or goat skins.

Since 1913 a great change has taken place in the standard of living of even ranchers and teamsters. The $12.50 coat has vanished. Dog, goat, and kid skins are used for more expensive garments and for trimming on expensive cloth coats. Certain kid skin coats dutiable under the present act at 15 per cent are retailed at several hundred dollars.

There is absolutely no reason why *dressed* dog, goat, or kid skins, either singly or in the form of mats, plates, or crosses should pay less duty than any other dressed fur skins, namely, 25 per cent under the present act. We recommend that the act be amended to meet this condition. [Italics mine.]

The foregoing excerpt from the brief of the National Association of the Fur Industry is, of course, not quoted as evidence of the facts recited therein, but as a statement made before a congressional committee which was formulating a tariff bill and as indicating the basis for subsequent action by that committee and the Congress. It does appear, however, that much of the material contained in the excerpt confirms and dovetails with the evidence in the record before us. Testimony offered on behalf of both the plaintiff and the defendant establishes that kidskins have been imported either in the raw form or in the form of plates and mats, the individual skins in which have been subjected to the so-called "China process" prior to the making of the plates and mats.

Plaintiff's witnesses testified that the same process was used in the dressing of dogskins, goatskins, and kidskins, and was in universal use in China. Some of them referred to it as "Chinese dressing," "China dressing," or "the Chinese process of dressing." Corroboration of this is to be found in defendant's exhibit 9, being pages 2 and 3 of a pamphlet copyrighted in 1937 and entitled "Fairchild's Manual of Furs—What Do You Know About Furs?" The author of the pages referred to, comprising an article under the caption "Chinese Lambs and Kids," was Jack Rosenblatt, an officer, prior to his death, in the plaintiff corporation, and an authority on the subject. The article, which is in question and answer form, contains, among other things, the following:

Q. 5. Do the lambs and kids come in from China in a raw state?

A. The best skins all come in raw. Skins of poorer quality come into this country in plates, and plates always come in dressed.

In the same article the author refers to the plates as "Chinese-dressed plates."

Thus it would appear to be obvious that the "dressed" skins and the "dressing" referred to in italics in the above-quoted excerpt from the brief presented to the Committee on Ways and Means were dressed by the so-called "China process" hereinbefore described.

Furthermore, it is obvious from a consideration of the excerpt as a whole that the changes sought related to plates, mats, and crosses of dog, goat, and kidskins in the same condition as those covered by the 1922 act provision, wherein the word "dressed" was not used.

It is clear that it was not sought by the National Association of the Fur Industry to make any distinction between plates, mats, and crosses of dog, goat, or kidskins dressed by the so-called "China process" and those otherwise dressed, for the entire record and the legislative history indicate that plates, mats, and crosses of such skins were never imported in a condition in which the skins were dressed by any other process.

It must be remembered that at the time of the consideration and passage of the Tariff Act of 1930 the question as to whether furs were "dressed" by the so-called "China process" within the meaning of that term as used in the trade and commerce of the United States had not been the subject of judicial decision. Consequently, neither in the "Memorandum of Court Decisions Affecting the Tariff Act of 1922" nor in the "Summary of Tariff Information, 1929," prepared for the use of the Committee on Ways and Means, House of Representatives, by the Tariff Commission in 1929, was there any suggestion as to the use of the term "dressed" as applied to plates and mats of dog, goat, and kidskins, and the first time in the legislative history of the provision that the word "dressed" appears is in the recommendation of the National Association of the Fur Industry noted above.

In the bill introduced as H. R. 2667 the provision with which we are here concerned reads as follows:

PAR. 1520 (a) Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; all the foregoing, if dyed, 30 per centum ad valorem.

It is obvious from the foregoing that the particular provisions of the bill as introduced followed the recommendation of the National Association of the Fur Industry.

In House Report No. 7, accompanying H. R. 2667, no specific reference was made to the fur provisions, but the following statements appear on pages 132 and 133 as indicating the general intention with respect to the changes in rates and phraseology which had been made in schedule 14 of the 1922 act:

REQUESTS FOR CHANGES AND MATERIAL CONSIDERED

At the recent hearings in connection with tariff readjustments American manufacturers requested changes in rates and phraseology affecting about 80 per cent of the 60 paragraphs in this schedule.

In the preparation of Schedule 14 [Schedule 15 in the new act] the committee gave careful consideration to the testimony of the witnesses *and to the briefs submitted.* It also had available the Summary of Tariff Information, 1929, prepared by the United States Tariff Commission as well as the commission's reports to the President and to the Senate, preliminary statements of information issued to the trade and other data obtained by the commission in the course of cost and other investigations. The experts of the commission also furnished additional information on various commodities.

\*     \*     \*     \*     \*     \*     \*

## CHANGES IN PHRASEOLOGY AND RATES

Changes were made in phraseology mainly for the following reasons: (1) To make more clear the intent of the Congress with respect to classification of commodities upon which there has been considerable litigation. (2) To provide separate rates of duty on a greater number of specific commodities in order that records of imports might not be unavailable due to their falling in basket clauses and losing their identity. [Italics added.]

\*       \*       \*       \*       \*       \*       .\*

Thus it is clear that there was no intention by the inclusion of the word "dressed" or of the word "kid" in the then new tariff bill to cover other plates and mats of dog, goat, and kidskins than those which had been included under the designation in the 1922 act of "plates and mats of dog and goat skins."

There was no discussion on the floor of the House concerning the provisions here involved, and on May 28, 1929, H. R. 2667 was passed by the House of Representatives, with no change in the paragraph in question save that it was renumbered as paragraph 1519.

Hearings were held before the Senate Committee on Finance at which time a brief was presented by the National Association of the Fur Industry requesting the insertion of the words "linings" and "strips" after the word "plates" in the provision passed by the House. A brief was also filed by the Fur Dressers' and Fur Dyers' Association (Inc.), which is particularly interesting in view of the fact that it points out that the dressing process applied to dogskins in China (which, as has been stated, is the same as that applied to kidskins) "is done   \*   \*   \*   in open lots, thereby avoiding the expense and upkeep of the building which the American firms have to maintain through the year," and that "*Chinese dressing* is cheaper because it is done in open fields or lots by coolie labor at starvation wages" [italics added], which statements are very largely confirmed by the record in the case at bar and further indicate that the "Chinese dressing" to which the attention of Congress was called was the same as the so-called "China process" with which we are here concerned. (See pp. 288–292 of a volume entitled "Tariff Act of 1929, Hearings before a Subcommittee of the Committee on Finance, United States Senate,   \*   \*   \*   Volume XV.")

As the bill was reported to the Senate by the Finance Committee on September 4, 1929, the provision in question read as follows:

\*   \*   \*   dressed dog, goat, or kid skins, and plates, mats, linings, strips, and crosses thereof, 10 per centum ad valorem; any of the foregoing, if dyed, shall be subject to an additional duty of 5 per centum ad valorem.

and the accompanying Senate Report No. 37 states:

Dressed dog, goat, or kid skins, and plates, mats, etc., thereof, are made dutiable, at the rate of 10 per cent ad valorem. The words "linings, strips," have been added in order that importations under the classification will receive the same rate as plates, mats, etc.

\*       \*       \*       \*       \*       \*       \*

The bill was passed by the Senate as reported by the committee, went to conference, and the Senate and House conferees recommended the following (Report No. 1326):

Amendment numbered 761: That the House recede from its disagreement to the amendment of the Senate numbered 761, and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment insert *and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; all the foregoing, if dyed, 30 per centum ad valorem;* and the Senate agree to the same.   [Italics in original.]

and the managers on the part of the House made the following statement with respect to the action:

Amendment No. 761:   The House bill imposed a duty of 25 per cent ad valorem on plates, mats, and crosses of dressed dog, goat, or kid skins.   The Senate amendment reduces this duty to 10 per cent and makes a clarifying amendment. The House recedes with an amendment restoring the rate of duty in the House bill and making a clarifying amendment.

Action was taken by both Houses and the bill as passed and approved by the President contained the provision recommended by the conferees.

It is clear from the foregoing that as understood and used by those who proposed its inclusion in the provision in the Tariff Act of 1930 for plates and mats of kidskins, and as understood and used by the congressional committees which labored on the bill and by the Congress which passed the same, the term "dressed," applied to plates and mats of kidskins, included the treatment by which the skins in such plates and mats were known as "China dressed" or "Chinese dressed" and which is the so-called "China process" here involved. It cannot, therefore, be questioned that among the commodities which were the subject of the foregoing legislative history of the provision in question, on which commodities Congress intended to impose the 25 per centum rate of duty, was the commodity which we have before us, i. e., plates and mats of kidskins dressed by the so-called "China process."

The legislative intent being thus manifest, it is immaterial whether, as hotly disputed in the record, the plates and mats in question were usable in their imported condition without the application of an American dressing and dyeing operation, whether the sewing done in China was permanent or not usable, or whether in fact the plates were subjected to processes of dressing subsequent to their importation.   The sole issue is whether the plates and mats at bar are such as were intended to be covered by the provision under which classification and assessment were made, and I am satisfied that they are.

In my view, therefore, the judgment of the court should overrule the protest claims.