(C. D. 1643)

A. S. GOLD & BRO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 7, 1954)

*Barnes, Richardson & Colburn* (*Albert MacC. Barnes, Hadley S. King*, and *Eugene F. Blauvelt* of counsel); and *Strauss & Hedges*; *Siegel, Mandell & Davidson*; *John D. Rode*; *Lane, Young & Fox*; *Brooks & Brooks*; and *Lane & Wallace*, associate counsel, for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil* and *Richard E. FitzGibbon*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and FORD, Judges; MOLLISON, J., dissenting

OLIVER, Chief Judge:  This case involves the classification of lambskin plates exported from China and entered at the port of New York. Duty was assessed on the merchandise at the rate of 35 per centum ad valorem under the provisions of paragraph 1519 (b) of the Tariff Act of 1930, which reads as follows:

Manufactures of fur (except silver or black fox), further advanced than dressing, prepared for use as material (whether or not joined or sewed together) including plates, mats, linings, strips, and crosses (except plates, mats, linings, strips, and crosses of dog, goat, and kid skins), if not dyed, 35 per centum ad valorem; if dyed, 40 per centum ad valorem.

Plaintiff's principal claim is that the merchandise is free of duty under paragraph 1681 of the Tariff Act of 1930, which provides for "Furs and fur skins, not specially provided for, undressed." An alternative claim is made for classification as nonenumerated manufactured articles under paragraph 1558 of the Tariff Act of 1930, carrying a dutiable rate of 20 per centum ad valorem.

Plaintiff's claim for free entry is based on the premise that the lambskin plates in question are merely undressed furs or fur skins, and that under clear and unambiguous language of paragraph 1519 of the Tariff Act of 1930, as judicially construed in a line of cases, hereinafter discussed, the present merchandise is excluded from the provisions of paragraph 1519 (b), as assessed, and is properly classifiable under said paragraph 1681.

To support its contentions, plaintiff introduced the testimony of 15 witnesses, who may be divided into 3 general categories, i.e., importers of and dealers in furs and fur skins, fur dressers and dyers, and fur garment manufacturers. Each of the witnesses showed many years of experience in the particular branch of the fur business in which he has been engaged, and all of them were amply qualified to supply the factual foundation upon which plaintiff has presented its case.

Before discussing plaintiff's testimony, mention should be made of the pretrial conferences that resulted in certain agreements which became the subject of stipulated facts entered into between counsel

for the respective parties during the course of the trial. The agreed facts are as follows:

(1) That the articles in question "are imported, invoiced, bought and sold and dealt in and known as lambskin plates."

(2) That these lambskin plates "are oblong in shape and measure approximately 24 inches by 48 inches, with a possible variation as much as two inches in either direction."

(3) That plaintiff's exhibits 1 to 8, inclusive, "are illustrative of the merchandise before the Court."

(4) That the lambskin plates in question were subjected to the same "China dressing process" as that applied to the kidskin plates that were the subject of the decisions in the cases of *Kung Chen Fur Corp.* v. *United States*, 24 Cust. Ct. 24, C. D. 1203, affirmed in *United States* v. *Kung Chen Fur Corporation*, 38 C. C. P. A. (Customs) 107, C. A. D. 447, and *Kung Chen Fur Corpn.* v. *United States*, 29 Cust. Ct. 266, C. D. 1480 (not appealed).

The so-called "China dressing process" which was applied, as conceded by the parties, to the lambskin plates in question was described in our decision in the *Kung Chen Fur Corp.* case, C. D. 1203, *supra*, as follows:

The raw kidskins were first soaked in water until soft; then they were scraped with a certain kind of knife to remove blood, dirt, and flesh from the under side of the skins. Following this, they were placed in vats, called "kongs," into which had been poured a solution consisting of water, millet flour, and sea salt. They remained in this solution from 3 to 7 days, depending upon temperature, type of skin, etc., during which time they were occasionally stirred. After they were removed from the kongs they were hand-kneaded to soften them, and then they were permitted to dry, after which they were again softened by hand and then piled with a heavy weight on top to keep them flat. Following this, the skins were sorted according to the different types of hair character, after which groups of selected skins were laid out within a marked-out area or block which was the size and shape of the ultimate plates or mats. The rough edges and the bad pieces were trimmed off the skins, and if this resulted in an unfilled area in the marked-out block, other pieces would be fitted therein. Following this, the skins were sewn into the rectangular sheets of fur which are the plates in question.

The said *Kung Chen Fur Corporation* cases held that the "China dressing process" did not produce "dressed" skins, as contemplated by paragraph 1519 (a), and, in reaching that conclusion, the Court of Customs and Patent Appeals in its decision in C. A. D. 447, *supra*, cited and followed a series of cases involving the dutiable status of dogskins and goatskins. *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902; *United States* v. *Arnhold & Co., Inc., et al.*, 27 C. C. P. A. (Customs) 135, C. A. D. 74; *United States* v. *Winograd Bros., Inc.*, 32 C. C. P. A. (Customs) 153, C. A. D. 302. The *Rotberg & Krieger* and the *Arnhold & Co., Inc., et al.*, cases related to the classification of dogskins; the *Winograd Bros., Inc.*, case involved the dutiable status of goatskins. All of the said cases are authority for

the proposition, as stated by the appellate court in the *Kung Chen Fur Corporation* case, C. A. D. 447, *supra*, "that the dressing contemplated by the adjective 'dressed,' used in paragraph 1519 (a), was not the treatment shown to have been made in China, but the dressing contemplated by American trade standards, the test of such standard being, as expressed in the brief on behalf of the importer before us in the instant case, 'the usability in the United States of the imported fur in the manufacture of fur garments or fur articles.' "

Five importers of and dealers in Chinese furs and fur skins, who testified on behalf of plaintiff herein, and whose business included the handling of very substantial quantities of lambskin plates and kidskin plates, stated that the present merchandise (exhibits 1 to 8, *supra*) is stiff, boardy, and greasy, and possesses the general characteristics of raw skins; that, therefore, these lambskins are undressed; that they are not usable in their imported condition; that they are always dressed according to American standards and generally dyed by American dyers prior to their ultimate use by fur manufacturers; and that practically all imported lambskin plates, such as those under consideration, are sold to fur garment and fur trimming manufacturers. Another phase of their testimony shows that there are certain advantages obtained in importing plates of lambskins over individual skins. In that connection, the witnesses' testimony is to the effect that the shipment of plates of skins affords greater compactness in packing that facilitates storage and preservation of the skins and that there is a substantial saving in costs for dressing and dying plates, as compared with individual skins. Plaintiff's witness, Rosenblatt, an importer who has been buying furs and fur skins for more than 25 years, stated that "an individual skin would cost about 85 cents for dressing and dyeing, a plate would cost about $1.25 to dress and dye." In some instances, the cost of dressing and dyeing individual skins would be 8 or 9 times greater than for an equal amount of skins in the form of plates.

Plaintiff's testimony, describing the treatment given to the imported lambskin plates to dress the skins according to American standards, was offered by three witnesses, all of whom had more than 20 years' experience in dressing and dyeing furs and fur skins. All of them corroborated statements of the previous witnesses, hereinabove referred to, to the effect that the lambskin plates in question are raw or undressed, and that they are not susceptible of any use in their imported condition. These witnesses also supported testimony of the previous ones, relating to the economic advantage of importing plates and showing the substantially lower costs for dressing and dyeing lambskin plates, when compared with such costs for individual skins. The description of the dressing processes applied to the lambskin plates, after importation, is adequately contained in the

testimony of plaintiff's witness, Sultzer, who was engaged in the fur dressing and dyeing business "from April, 1926 until around September, 1951." The witness' explanation can be summarized as follows:

The imported lambskin plates (exhibits 1 to 8, *supra*) are put into a revolving drum containing dampened sawdust. The effect of the dampened sawdust is to remove undesirable materials (Chinese rice powder, dirt, etc.) and also to soften the plates of skins. Following this cleansing and softening process, the plates are treated with oils of various types used in the tanning and the dressing of leather. Usually, the oil is applied to the plates in a drum in which it is circulated with a small amount of sawdust. Sometimes the treatment with the oil is done by hand. To insure thorough permeation of the oil into the skins, the lambskin plates are allowed to remain in the drum with the oil "for several days" and, thereafter, the plates are given a cleaning to remove "all the superfluous oil" and to put the skins in condition for treatment with "chrome alum," a tanning agent that ultimately gives the skins an appearance simulating leather. Finally, the skins are given "a finish drumming in sawdust and cleaning." This complete processing produces dressed plates (plaintiff's illustrative exhibits 9 and 10) that are pliable and soft and ready for use in the manufacture of fur garments or other fur articles. All of the witnesses agreed that the dressing processes applied to lambskin plates are essentially the same as those used in dressing kidskin plates.

Plaintiff completed its line of proof by introducing testimony of six manufacturers of fur garments who used lambskin plates that had been processed, as hereinabove described and as represented by said illustrative exhibits 9 and 10. The combined testimony of these manufacturers with respect to the use of dressed lambskin plates in their manufacturing operations shows that when the plates are received from the dressers and dyers they are always cut apart and separated into their component skins, which are sorted according to luster, hair quality, and general character for proper setting into the pattern of the garment or article to be manufactured. The complete separation of the plate into the individual skins is necessary because the Chinese matching is never satisfactory to the American manufacturer. The Chinese, in sewing the plates of skins, customarily place the better quality of skins in the center of the plate. The American manufacturer always uses the skins to their best advantage, and, in doing so, the better quality of skins, found in the center of the plates, is taken for the front and back of the garment, while the comparatively inferior qualities of skins are utilized in the less conspicuous places of the garment. To separate the individual skins and make them available for arrangement according to the pattern

for the finished garment, the manufacturer must cut through the fur alongside all the hand-sewn Chinese seams. The cutting operation always results in a loss—in some cases, as much as 20 per centum of a plate—made up of damaged, unmatched, or otherwise undesirable pieces of fur. Because of the additional labor required in cutting and matching the individual skins and the waste resulting from those operations, there is a definite disadvantage in manufacturing a fur garment from a plate, rather than individual skins. The additional costs thus encountered reduce, to some extent, the saving realized in the transportation charges and costs of dressing of the raw imported plates, but all of the witnesses recognized that the use of plates has an overall advantage over the individual skins.

There is no contradiction herein of plaintiff's testimony to the effect that these lambskin plates are not usable in their imported condition and that they have to be prepared, either by dressing, or dressing and dyeing, for their ultimate use in the manufacture of fur articles in this country.

Defendant's testimony, introduced by four witnesses, relates entirely to the use of dressed and dyed lambskin plates by American manufacturers of fur articles. Defendant's first witness, a furrier, used dressed lambskin plates over a period of 8 or 9 years, in manufacturing short capes, as a contractor for a "cloak house." The second witness stated that he has been a "fur cutter" for 40 years and that during the years 1932, 1933, and 1934 he cut dressed plates, like plaintiff's illustrative exhibits 9 and 10, to patterns for fur coats. Another witness, a fur manufacturer, used dressed lambskin plates in making collars and cuffs and garments during the years 1930 to 1934, inclusive. Defendant's last witness, a fur manufacturer with 23 years' experience, admitted that his experience with dressed lambskin plates had been confined to their use "for trimming purposes, collars and cuffs."

The combined testimony of defendant's four witnesses shows that invariably it is necessary to replace unmatched and damaged skins in a plate with desirable ones to suit the pattern of the fur article to be manufactured and that it has never been necessary to take apart every skin and every piece of fur in a plate. It appears further from defendant's testimony that the Chinese sewing of plates is never "too good" and that "as a rule, their seams would have to be resewn," which resewing is done by machine. The work might be done by the dressers or dyers or by operators in the manufacturer's plant. Where a plate does not follow the perimeter of a pattern, either more material is added or excess material is removed, whatever may be required by the condition. Where cutting of a plate is necessary, it is done "alongside the seam, just in order to get it straight." Defendant's witness, Ciri, who used dressed lambskin plates only for trimmings,

stated that he treated the plate as a unit, just like a piece of fabric or a piece of cloth, so that, in following the pattern of a collar or a cuff, the skins were cut without regard to their contour.

It will be noted that the contradictory phase of the testimony introduced by both parties relates to the cutting of the plates, plaintiff's witnesses stating that they always separate the plates into the component skins, while defendant's witnesses never found it necessary to separate all of the skins before cutting them to the pattern of the article to be manufactured. This disagreement in the testimony, in the light of the entire record herein, merely reflects a difference in the manufacturing processes and procedures of various manufacturers. Plaintiff's witnesses, who had been handling lambskin plates over long periods of time and whose volume of business with such merchandise extended into very large and substantial quantities, showed that the usual practice for manufacturers has been to separate the individual skins, which method established the use of the skins to the best advantage in the manufacture of fur garments.

Based on the record before us, we find that the preponderance in weight of the evidence establishes that the importation of lambskins in plate form facilitates transportation of the skins and also their treatment in this country to meet American standards; that the lambskin plates in question were undressed at the time of their importation; that, in their condition as imported, they were not usable; and that, after importation, they were prepared for their ultimate use by manufacturers through the processing of either dressing, or dressing and dyeing, and then completely separated into their component skins.

The facts herein are substantially the same as those which prevailed in the *Kung Chen Fur Corporation* cases, *supra,* which the Court of Customs and Patent Appeals, in its decision, C. A. D. 447, *supra,* so succinctly expressed as follows:

It is our view, as we understand it to have been the view of the trial court, that any insistence that the formation of the plates was a dressing step is wholly untenable. So far as we can discern, making the skins into plates did not advance them toward any use intended to be made of them in the United States in any respect whatsoever. It is doubtlessly true that in the form of plates the skins can be more conveniently and economically treated, dyed, and dressed according to United States trade standards than they can be as individual skins, but that does not make the trimming given the skins and the sewing together in China a dressing process. The weight of the evidence is to the effect that the plates have to be ripped apart completely and the seams resewn before they can be used commercially in making garments.

Government counsel, during the course of the trial, set forth defendant's position in the present controversy, as follows:

Mr. Weil: The Government's position, your Honor, very briefly is, firstly, from the language as used by Congress in 1519 (b), it is not a necessary prerequisite that the plates be dressed or be further advanced than dressing based upon the theory that the words "including plates, mats, linings, strips, and crosses"

are words of extension, and that the prerequisite that they be further advanced than dressing does not modify or is not applicable to the plates. Secondly, that if the Court does find that the plates have to be dressed in order to fall under 1519 (b), then it is the Government's position that they are dressed, that it is not necessary that they be dressed, but that they are dressed. Thirdly, it is the Government's position that the provision for plates in itself derogates against the merchandise being held dutiable as furs or fur skins, that a plate is a manufactured article and as such it cannot be dutiable as a fur or fur skin * * * .

Our conclusion, as hereinabove stated, that the present merchandise consists of plates of undressed lambskins, is dispositive of the Government's second contention claiming "that they are dressed." Defendant's third claim, alleging that "a plate is a manufactured article and as such it cannot be dutiable as a fur or fur skin," is one of the claims that was presented by the Government in the *Kung Chen Fur Corporation* cases, and therein held to be without merit. The record herein supports the same conclusion. Thus, our consideration is limited to defendant's contention that the words in paragraph 1519 (b), *supra*, "including plates, mats, linings, strips, and crosses" are words of extension, which, as stated in Government counsel's brief, "Extend the scope of that paragraph to include lambskin plates whether or not they be dressed." In support thereof, defendant cites the case of *Carlowitz* v. *United States*, 2 Ct. Cust. Appls. 172, T. D. 31681, which arose under the Tariff Act of 1909 and involved judicial interpretation of the provision in paragraph 439 of said act for "manufactures of furs, further advanced than dressing and dyeing, when prepared for use as material, including plates, linings, and crosses." The merchandise under consideration in the said *Carlowitz* case consisted of fur skins sewn into the form of crosses and linings. All of the skins were dressed; some of them were also dyed. The court found from the testimony and the samples that "much time and labor has been devoted to the matching and cutting of the different pieces making up these importations," which resulted in "perfectly matched and selected crosses and linings." It was also shown by the record, as stated by the appellate court, that the merchandise was "prepared for the use of the furrier and other manufacturers of furs."

It is readily discernible from the record before us, as hereinabove outlined, that the plates of lambskins in question are materially different from the crosses and linings of dressed skins involved in the *Carlowitz* case, *supra*. The very definite distinction between the classes of merchandise the subject of the cited case and the plates of lambskins now under consideration renders inapplicable here the reasoning followed there.

A significant part of the *Carlowitz* case is the court's analysis of the provision in paragraph 439, *supra*, set forth as follows:

Whilst the provision opens with the phrase "manufactures of furs," the subsequent limitations placed upon that phrase in that such shall be "further ad-

vanced than dressing and dyeing," and be such as are "prepared for use as material," indicate that the term "manufactures of furs" was not used by Congress with a view to including therewithin and making here dutiable only such things as arise to the dignity of manufactures *of* furs in the sense of articles completed, ready for final use, as distinguished from such manufactures constituting materials for further manufacture. It was a phrase used, by Congress in connection with the subsequent limiting words to define by the entire expression a condition of merchandise upon which a rate of duty is levied, which, however, in fact had not reached a condition coming fully and completely within the term "manufactures of furs" in the sense last above stated. The provision transposed, it seems to us, essentially provides as if it read "materials prepared for use when made of furs further advanced than dressing or dyeing." This provision is tantamount to a description of the condition of merchandise constituting materials for and levying duties thereupon rather than an enactment assessing duties upon manufactures of that merchandise. That result is inherent from the very terms of limitation placed upon the phrase "manufactures of furs," as used in the statute. [Italics quoted. ]

Applying the foregoing analysis to paragraph 1519 (b) of the Tariff Act of 1930, the subject of the present discussion, it is quite clear that the plates of lambskins in question are removed from classification thereunder. First of all, the merchandise before us was not "prepared for use." On the contrary, these plates of lambskins were unusable in their imported condition and required considerable processing or treatment, and manipulation, to become available for ultimate use by manufacturers. Furthermore, the plates were made up of *undressed* lambskins, a condition which excludes classification under said paragraph 1519 (b), as it specifically provides that the merchandise classifiable thereunder shall be "further advanced than dressing."

The *Kung Chen Fur Corporation* cases, *supra*, held plates of undressed kidskins to be free of duty under paragraph 1681, *supra*. Those cases presented facts and circumstances that so closely parallel the conditions concerning the processing in China, the treatment in this country, and the ultimate use by American manufacturers of the lambskin plates in question that the classification invoked in the said cases should also apply in the present case. Accordingly, we hold the plates of undressed lambskins in question to be free of duty under said paragraph 1681, as claimed.

The reasoning followed and the conclusion reached make it unnecessary to discuss other points of argument presented in the briefs of counsel for the respective parties.

The protest is sustained and judgment will be rendered accordingly.

DISSENTING OPINION

MOLLISON, Judge: I am constrained to dissent from the decision and judgment of my colleagues in this case. The legal situation herein is distinguished from that which obtained in the case of *United States* v.

*Kung Chen Fur Corporation,* 38 C. C. P. A. (Customs) 107, C. A. D. 447, cited and relied upon by the majority, by reason of the particular language of the tariff provision under which the lambskin plates at bar were assessed with duty, which provision is different from that under which the kidskin plates in the *Kung Chen* case were assessed. In short, a different issue is here presented.

The kidskin plates in the *Kung Chen* case were classified by the collector of customs under paragraph 1519 (a) of the Tariff Act of 1930, which reads:

Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins * * *.

The lambskin plates at bar were classified by the collector under paragraph 1519 (b) of the same act, which reads:

Manufactures of fur (except silver or black fox), further advanced than dressing, prepared for use as material (whether or not joined or sewed together) including plates, mats, linings, strips, and crosses (except plates, mats, linings, strips, and crosses of dog, goat, and kid skins) * * *.

Language substantially the same as that immediately above was construed by our appellate court in *Carlowitz* v. *United States,* 2 Ct. Cust. Appls. 172, T. D. 31681, and it was held that the words "plates, linings, and crosses," appearing in paragraph 439 of the Tariff Act of 1909, were words of extension rather than specification, and that whether they were dressed or dyed or not plates, linings, and crosses were properly dutiable thereunder.

The rationale of that decision is that plates, etc., are manufactures of fur (*Caracul Fur Co. (Inc.) et al.* v. *United States,* 17 C. C. P. A. (Customs) 262, T. D. 43687) in the sense that they represent a class of fur material, advanced beyond the raw state but not made into fur articles.

The fact, pointed out by the majority herein, that the linings in the *Carlowitz* case were dressed while the plates in the case at bar were not dressed makes no difference in the result. In expounding the law in the *Carlowitz* case, our appellate court was emphatic in pointing out that inasmuch as the words "plates, linings, and crosses" were words of *extension,* they were not limited by the words "further advanced than dressing and dyeing," which followed the designation "Manufactures of fur." The court held that the statutory words "including plates, linings, and crosses" had the effect of including plates, linings, and crosses in the category of "manufactures of furs" without limiting them to such as were "further advanced than dressing and dyeing."

I am further constrained to dissent for the reason that I believe that the words "Furs" and "fur skins," as used in paragraph 1681 of the free list, do not embrace plates of fur in view of the evident plan or arrangement of Congress in the classification of furs and fur products

whereby plates, etc., are very carefully distinguished and treated separately from other classes of furs and fur products. I refer to my dissenting opinion in the case of *Kung Chen Fur Corpn.* v. *United States*, 29 Cust. Ct. 266, 270 *et seq.*, C. D. 1480, wherein this matter is more fully discussed.