(C. D. 1952)

Joseph Rotberg & Co., Inc.
W. J. Byrnes & Co. of N. Y., Inc. } *v.* United States

United States Customs Court, First Division

(Decided January 3, 1958)

*Barnes, Richardson & Colburn (Eugene F. Blauvelt, Albert MacC. Barnes,* and *Hadley S. King* of counsel) for the plaintiffs.

*George Cochran Doub,* Assistant Attorney General *(Joseph E. Weil,* trial attorney), for the defendant.

Before Oliver, Mollison, and Wilson, Judges

Wilson, Judge: The merchandise covered by these protests consists of certain kidskins and lambskins imported from Argentina in 1943. These importations were classified under paragraph 1519 (a) of the Tariff Act of 1930, as modified by T. D. 50504, as "dressed" fur skins. The kidskins were assessed with duty at the rate of 12½ per centum ad valorem and the lambskins at 15 per centum ad valorem. Plaintiffs claim the merchandise is properly free of duty under the provisions of paragraph 1681 of the tariff act as "Furs and fur skins, not specially provided for, undressed."

Counsel for the importer agreed that the skins in question are not "raw" and that they had been subjected to some sort of processing prior to exportation. It is contended, however, that the skins in question are not "dressed" within the meaning of paragraph 1519 (a) of the tariff act under which they were classified.

Several exhibits were received in evidence:  A sample skin representative of the merchandise invoiced as lambskins, plaintiffs' exhibit 1 (R. 20); another skin representative of the imported kidskins, plaintiffs' exhibit 2 (R. 22); and defendant's exhibit E, a sample skin of the type admittedly received by the plaintiffs during the period here involved (R. 76), together with certain other skins alleged by the defendant to be similar to the skins here in issue and to have been received by the plaintiffs during the involved period (defendant's exhibits F and G (R. 87, R. 91)).  Defendant's exhibit J is a sample part of the imported skins invoiced as "Lincoln South American Lamb" (R. 21, R. 193–197).  The defendant also introduced in evidence some documents issued by the Government relative to the exclusion from importation of certain items, including "undressed" goat and kidskins (defendant's exhibit C (R. 281) and defendant's exhibit D (R. 66)).  It appears that skins such as those here in issue were imported from the middle of the year 1943 to the latter part of 1944, and that about 1,944 "undressed" goat and kidskins were by governmental regulations prohibited from importation into the United States (R. 45, 56).

At the trial of the case, eight witnesses were called by the plaintiffs and six testified on behalf of the Government.  The record in this case discloses that all of the plaintiffs' witnesses, including the importer of the involved merchandise, had handled large numbers of skins, such as plaintiffs' exhibits 1 and 2.  From their testimony, it appears that skins in the condition of those here imported were not sold or delivered directly to manufacturers of fur garments, but that, after their arrival in this country, such skins were always sent out to dressers and dyers for further processing, so as to render them fit to be made into fur garments or other fur articles (R. 28–30; R. 104; R. 120–121; R. 221; R. 242).  In the latter connection, certain of the plaintiffs' witnesses, who had personally supervised the dressing and dyeing of skins of the character here in question, testified to the effect that such skins were always subjected to an elaborate dressing process after their arrival in this country (R. 136; R. 168–171; R. 205–209).  The process generally, prior to dyeing, to which skins, such as plaintiffs' exhibits 1 and 2, were subjected after importation, according to plaintiffs' witnesses, was as follows: The skins were washed in a very mild alkaline solution to remove any grease that might have accumulated on the skin.  After washing, the skins were put in a vat into a chrome alum solution where they remained overnight.  The next day, the skins were put in a centrifugal machine which whirled the skins, thereby extracting the solution.  Thereafter, the skins were "caged," i. e., placed in a revolving drum and subjected to a "tumbling process" for from 10 to 15 minutes to open up the skins.  They were then dried, after which they were given a drumming with

wet sawdust in a drum similar to the "cage," following which process they were put in a so-called "kicker" or open vat with grease, where the grease was mechanically "kicked" into the skin. The skins remained in the kicker for an hour or two, after which they were removed from the kicker and again given a drumming with the same sawdust previously used to remove the surplus grease. In between the drumming processes, there was a manual operation consisting of pulling the skins across a dull knife to open up the pores. Thereafter, the skins were given a final drumming to remove the maximum amount of sawdust so that there would be no excess hair or grease on the leather. The skins were then ready for dyeing (R. 137–141; R. 168–171; R. 205–209).

Plaintiffs' witnesses, while agreeing that there had been some processing on the skins represented by plaintiffs' exhibits 1 and 2, testified that, nevertheless, they are not "dressed" skins (R. 35–37; R. 69; R. 99–101; R. 114), inasmuch as, in the condition as imported, such skins were never used for the making of fur garments or fur articles and could not be so used (R. 121; R. 223–226; R. 243). Even two of the witnesses for the Government, who, for many years, had been associated with dressers and dyers and who had personally supervised the dressing of fur skins, agreed that the skins represented by plaintiffs' exhibits 1 and 2 are "crudely" or "very poorly" dressed (R. 313; R. 323–324).

Respecting certain of the fur skin samples introduced by the Government, plaintiffs' witness Rotberg stated that defendant's exhibits E and F, although not "raw," are "undressed" (R. 71–73; R. 81). While plaintiffs' witness Sultzer stated that defendant's exhibit G was "dressed," he was of the opinion that the skin represented thereby came into this country "raw" and then was dressed here (R. 161). He testified further that defendant's exhibit E would require processing before dyeing (R. 162). Plaintiffs' witness Ruderman was of the opinion that defendant's exhibits F and G "might be suitable" for dyeing in their present condition, but that it was "very doubtful" that defendant's exhibit E was suitable for dyeing without further processing (R. 183–187). Plaintiffs' witness Ruderman was of the opinion that defendant's exhibit J was "dressed" and that it did not require the dressing process necessary in the case of plaintiffs' exhibits 1 and 2. He testified, however, that he was not familiar with the processing "which has been applied to Plaintiffs' Exhibits #1 and #2" (R. 197–198).

On behalf of the Government, Mr. Frederick Stubbe, the examiner who advisorily classified the imported merchandise, testified that plaintiffs' exhibits 1 and 2 are not now in the same condition as they were when extracted from the bales at the time of importation, but that, as originally received, "were soft and pliable, the hide had

been made and converted into a leather" (R. 282). Substantially the same testimony was given with respect to the condition of defendant's exhibits E, F, G, and J, at the time of importation. Government's witness further testified that, in connection with his duties, he had examined "raw" South American lambskins and kidskins, which he stated were different from the skins contained in plaintiffs' exhibits 1 and 2 in the latters' condition at the time of importation, in that such "raw" skins, as imported, were "stiff and boardy," having no pliability or softness, and would readily crack and tear if they were manipulated in any way. In this connection, Mr. Stubbe stated that the "raw" skins he had examined had not been fleshed, and that, while there were bits of flesh which still adhered to plaintiffs' exhibits 1 and 2, near the paws or along the extreme edges of the skins, there was no flesh remaining in the main body of the imported skins (R. 283).

Government's witness, John Redling, who, the record discloses, had been employed for about 34 years with the Alaska Chemical Corp., dresser and dyer of kidskins, broadtail, African persians, squirrels, and other types of skins, in which connection he had been in charge of the fleshing, finishing, and drumming departments, testified that he had handled many raw skins before and after the dressing process, averaging some 10,000 Chinese caracul and about 5,000 Persian lambskins and Southwest African lambskins a day. The witness stated that he had processed certain skins known as "Lincoln lambs," which, he testified, were similar to the skins represented by plaintiffs' exhibits 1 and 2. In his opinion, the skins contained in the latter exhibits are "dressed" skins. On cross-examination, however, Mr. Redling testified that, during the period here involved, the company with which he had been employed had not, to his knowledge, handled skins like plaintiffs' exhibits 1 and 2 (R. 338–341).

The question here for determination is whether the involved skins, in their condition as imported, are "dressed" skins (paragraph 1519 (a)) within the contemplation of the tariff act and dutiable as such, or whether they are properly free of duty under paragraph 1681 of the act for "Furs and fur skins, not specially provided for, undressed." In resolving the issue before us, certain decisions of this and our appellate court, hereinafter referred to, are pertinent.

In *Rotberg & Krieger* v. *United States*, 68 Treas. Dec. 895, T. D. 48068, the merchandise consisted of certain Chinese dogskins, which the evidence showed were not ready in their imported condition to be made up into fur articles, but which required further processing before being so manufactured. It appeared that the process that was applied to the skins in that case consisted of the removal of excess fat and dirt on the skins, drying in the sun, after which the dried skins were placed in barrels of water and flour where they remained

for 6 or 7 days, when the skins were again taken out and put in the sun for drying, the evidence establishing that the skins were so processed for purposes of preservation. The court held the skins in question were not dutiable under paragraph 1519 (a) of the Tariff Act of 1930 as "Dressed furs and dressed fur skins," but were properly free of duty under paragraph 1681 of the said act as "Furs and fur skins, not specially provided for, undressed." In so holding, the court stated, page 907, as follows:

* * * There is no dispute that the skins as imported are not and cannot be used in the imported condition. An examination of the samples themselves supports this fact. *They could not be manufactured into a fur garment or article ready to wear, in their imported condition. This is the criterion by which to determine whether or not a fur is dressed.* [Italics supplied.]

The holding of this court, as enunciated above, was upheld on appeal in *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902, the appellate court in this connection, page 445, stating as follows:

We regard it as being of small consequence that the merchandise may have been referred to in China as dressed dogskins, nor is it of particular importance under what name or names the skins were ordered. The question of what they actually are must be determined by United States trade standards. * * *

In *United States* v. *Arnhold & Co., Inc., et al.*, 27 C. C. P. A. (Customs) 135, C. A. D. 74, the so-called "China dressing" process that was applied to certain dogskins there involved was the same as the process given in the treatment of the dogskins involved in the *Rotberg* case, *supra*, with the exception that, in addition to the process described in the latter case, there was employed in the treatment of the skins in the *Arnold & Co.* case sea salt, to the extent of three-quarters to 1 pound to the gallon of water, it appearing that sea salt contains sodium sulphate and sodium chloride. Our appellate court, in the *Arnold & Co.* case, *supra*, held, in effect, that the process to which the involved skins were subjected to in the country of exportation did not render the skins "dressed" and that such treatment was merely for the purpose of preserving the skins in their natural state. The merchandise there in question was, accordingly, held to be free of duty under paragraph 1681 of the tariff act as fur skins, undressed. Of like tenor as to the meaning of the term "dressed," as used in paragraph 1519 (a) of the tariff act, was the holding of this and our appellate court in the cases of *United States* v. *Winograd Bros., Inc.*, 32 C. C. P. A. (Customs) 153, C. A. D. 302; *Kung Chen Fur Corp.* v. *United States*, 24 Cust. Ct. 24, C. D. 1203, affirmed in *United States* v. *Kung Chen Fur Corporation*, 38 C. C. P. A (Customs) 107, C. A. D. 447; *Kung Chen Fur Corpn.* v. *United States*, 29 Cust. Ct. 266, C. D. 1480; *A. S. Gold & Bro., Inc.* v. *United States*, 33 Cust. Ct. 120, C. D. 1643; and *Prime Fur Corp.* v. *United States*, 37 Cust. Ct. 83, C. D. 1802.

In the case at bar, the uncontradicted testimony of plaintiffs' witnesses establishes that, in their condition as imported, the involved skins were never used for fur garments and could not be so used, it further appearing that such skins were always put through an extensive dressing process in this country after importation in order to render them fit for their ultimate use. The record indicates that the imported skins were subjected to processing in the country of exportation to comply with certain regulations of the War Production Board during the period here involved, which prohibited the importation of lambskins and kidskins in a raw state. Admittedly, the skins in question are not "raw." However, the processing applied to these skins in Argentina does not render them "dressed," within the meaning of the term under paragraph 1519 (a) of the tariff act. They were not dressed according to United States trade standards, which, as the authorities indicate, is the test for "dressed" skins. All of the witnesses were in agreement that the processing of these skins in South America had not advanced them toward their ultimate use for manufacture into garments. Under the authorities heretofore referred to, it has been established that the provision for "Furs and fur skins * * * undressed" in paragraph 1681 of the Tariff Act of 1930 is not limited to "raw" furs, but includes all furs and fur skins which, in their imported condition, are not ready for use in the manufacture of fur garments or other fur articles. Accordingly, even though the imported skins have been processed beyond the raw state, they are "undressed."

Based on the record presented and the cited authorities, we are of opinion and hold that the imported skins, represented by plaintiffs' exhibits 1 and 2, are properly free of duty under paragraph 1681 of the Tariff Act of 1930 as "Furs and fur skins, not specially provided for, undressed." The claim in these protests is sustained. Judgment will be rendered accordingly.