(C.D. 4711)

RUDOLPH MILES & SONS, INC., A/C THOMAS P. GONZALEZ CORP. *v.* UNITED STATES

Court Nos. 74–8–02220 and 74–11–03241

(Decided August 12, 1977)

*Glad, Tuttle & White* (*Edward N. Glad* and *T. Randolph Ferguson* of counsel) for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General (*Steven P. Florsheim*, trial attorney), for the defendant.

RICHARDSON, Judge:   The merchandise in this consolidated action consists of dried, unground chili peppers which were exported from Mexico during the period between May, 1973 and March, 1974, and classified in liquidation upon entry at the port of El Paso, Texas, under TSUS item 161.80, the provision for anaheim and ancho peppers, at the duty rate of 5 cents per pound. It is claimed by the plaintiff that the merchandise is properly classifiable as unground capsicum or cayenne or red peppers other than anaheim and ancho peppers under TSUS item 161.83 as modified by T.D. 68–9, at the duty rate of 2.5 cents per pound. It is conceded by the parties that the merchandise in issue is not anaheim peppers.

The question presented for determination in the case is whether the imported chilies are "anchos" as contended for by the government or "pasillas" as claimed by the importer.

Testimonial and other evidence in the record bearing on the issue is conflicting. Thomas P. Gonzalez, president of the ultimate consignee, and who has been buying peppers such as those at bar for 40 odd years, testified (R. 15–16):

Q. Would you tell me what types of peppers you bought that were covered by these particular entries?

A. This importation, on one of my trips to Mexico, I purchased.

JUDGE RICHARDSON: Which case are you referring to now? You have two cases here.

THE WITNESS: I am referring to both.

JUDGE RICHARDSON: All right.

A. (Continuing) On trips that I made to Mexico, which I call buying trips, to purchase peppers. On both occasions, I was there prior to the shipments and purchased the chilis known as chilis pasillas, and I instructed the sellers to ship them. One of these entries in this case contain different chilis than the chili pasillas.

Q. Mr. Gonzalez, do you usually receive the chilies in the United States that you purchased from these farmers in Mexico when you are traveling in Mexico?

A. Do you mean, do I personally receive them?

Q. Do you get what you buy?

A. Yes, usually.

The witness identified exhibits A through I as being chili pepper samples from particular entries before the court. He also identified exhibits 1 through 3 as being samples of chili peppers sent to him by or at the direction of his customhouse broker at El Paso right after entries before the court were made, and said to have been taken from particular entries before the court, in keeping with his company's customary business practice of keeping and retaining for long periods of time samples sent by the customs broker. Although the witness was of the opinion that exhibits A through I were not identical in shape to exhibits 1 through 3, he was of the opinion that the chili pepper samples exemplified in exhibits A through I were of the same variety as those exemplified in exhibits 1 through 3. The witness identified them all as pasillas.

The witness identified exhibit 4 as a sample of merchandise received under entry 110939 which was purchased in a different area in the state of Chihuahua, Mexico, and which is known as a chilaca or hot pepper. The invoice in entry 110939 in court No. 74–11–03241 to which the witness refers describes the merchandise as "chile colorado seco."

Mr. Gonzalez testified that the ancho pepper is of a wide configuration. It is called ancho because of its shape, the term meaning "wide" in Spanish; and translated into English means "very wide pepper."

According to the witness the ancho is also characterized by its wrinkly skin; and is very dark red in color, almost black; but not as black as the pasilla pepper. Mr. Gonzalez stated that there is no regional difference with respect to the way the ancho pepper is described in Mexico. The ancho pepper is always called "ancho." He said that because it is such a well-known pepper which is only grown in a certain area it has always been "ancho," and has never had a different name in Mexico. There isn't any confusion in Mexico with regard to the "ancho."

With respect to the pasilla pepper Mr. Gonzalez testified that it is smaller than the ancho; it runs from narrow to a little wider than the anaheim which is longer and narrower than the ancho. The pasilla, almost tends to be black in color; it has less red color units than the ancho. Mr. Gonzalez stated that the pasilla pepper is always referred to as "pasilla" in the interior of Mexico and in Baja, California. And when asked on cross-examination if he ever noticed regional differences with respect to the way a pasilla pepper is described, the witness answered, "not too much on that one."

Dr. Roy M. Nakayama, associate professor of horticulture at New Mexico State Unitversiy was called as a witness on defendant's behalf. The witness has a bachelor of science degree from New Mexico State University where his major field was in agricultural botany, a master's degree in the areas of plant pathology and mycology from Iowa State University, and a Ph. D. degree from Iowa State University where his major fields of concentration were in horticulture, plant breeding, and plant pathology. He has authored four research reports on chili agriculture, varieties, and descriptions, has written articles on chili research which have been published in newspapers and magazines, and holds membership in professional associations concerned with chilies.

With respect to Mexican chilies, Dr. Nakayama testified that he has traveled in Mexico, has observed chili fields in central Mexico, talked with farmers and other people regarding chili, and is aware of the terminology these people use to describe chili. The witness, although admitting that he has had no experience with commercial chilies as such, stated that anchos are not grown commercially in Mexico but in gardens for local sales, primarily because of demand. As to terminology Dr. Nakayama testified (R. 61–62):

Q. Have you noted at all whether or not there are regional differences in Mexico to describe an ancho pepper, or something which you would refer to, or what would be referred to in the United States, as "ancho pepper?"

A. Yes, I have run up against that in the area along the Rio Grande, generally west and adjacent to Brownsville, Texas. They grow chili that fits the description, the fruit description of ancho, but they refer to it as a chili mulatto.

Q. Have you run into any other differences?

A. There are some that are called—very similar shaped pepper to the ancho—pasilla.

The witness pointed out that in identifying chili pepper the primary points he considers are general shape and size configuration and the texture of the fruit after it is dried, noting that some characteristics of chilies cannot be determined until they are dry.

Dr. Nakayama examined and identified exhibits A through I as anchos, and exhibits 1 and 2 as pasillas. He compared exhibit 2 with exhibits C, D, and E and stated that they are different varieties of peppers. The witness also agreed with the description of an ancho chili in exhibit L which he said is a grower's guide put out by Petoseed Company primarily for commercial growers. On pages 38 and 39 of exhibit L an ancho 101 pepper is described as "Dimpled, broad, tapering to a point," measuring "5½" inches long by "2½" inches in diameter, with flesh and color described as "Medium thick, mildly pungent, blackish-green."

Plaintiff contends that it has made a *prima facie* showing the merchandise covered by 15 of the 16 entries before the court consists of pasillas chili peppers and that of the 16th entry consists of chilaca chili peppers, and further, that defendant has failed to controvert plaintiff's evidence. Defendant contends that the questionable, vague, and circumstantial evidence offered by plaintiff is insufficient to rebut the presumption of correctness attaching to the classification of the imported peppers, and that there is no testimonial evidence that pasilla or chilaca peppers were in fact imported.

Although the evidence in the record is conflicting for the most part, the parties agree that the ancho variety of chili pepper is characterized by a wideness in body. And this wideness in physical appearance finds support in the description given of an ancho 101 pepper in exhibit L in the expression "broad," and in the measurement "5½" inches long by "2½" inches in diameter. Apparently, exhibit L addresses itself to description of fresh peppers judging from the fact that all of the varieties of peppers shown in the exhibit are of chilies in their fresh state.

Although some of the official samples taken at the time of entry of the imported chiles are no longer useful for examination purposes by reason of physical deterioration, others of them are still in a good state of preservation. One such remarkably well preserved official sample is the one identified as exhibit C, which resembles a bell pepper and at its widest point measures about 2½ inches and at its longest point measures 3½ inches. The sample is dried, flat, with skin wrinkled like a prune, and color varying from dark red to black.

On the other hand, the specimens in exhibit 2, long, thin peppers, with which exhibit C was compared by the witnesses Gonzalez and

Nakayama, measure about 1¼ inches in width by about 5¼ inches in length, and are dried, flat, with skin texture wrinkled like a prune, and are black in color with streaks or flecks of brown. Exhibit 2 specimens fit the description for dried pasilla chili peppers. When exhibit C is laid side by side with specimens in exhibit 2 the two give evidence of being distinctly different varieties of chili peppers in the court's view. Exhibit C is the essence of *wideness* while the specimens in exhibit 2 are the essence of *narrowness*, and this in a context in which shape and size are admittedly dominant factors in the identification of varieties of chili peppers. Allowing for shrinkage due to age and dryness, these exhibits appear to be dried anchos and pasilla varieties of chili peppers, respectively. As such, the court cannot see how the two varieties of peppers could be covered by any one entry and given a single classification.

Mr. Gonzalez has testified that samples designated as exhibits 1 through 3 were sent to him at the instance of the broker who made the representation to him that they were taken from entries of merchandise before the court. And on that basis the samples were received in evidence under the business entry rule. But this is not the same as establishing that these samples are in fact from the entries at bar. Evidence of such quality could only come from someone shown to be in a position to connect the samples with the entries at bar. *Cf.* *Romicks International, Inc.* v. *United States,* 64 Cust. Ct. 316, C.D. 3997 (1970). In this case that person would be the person who withdrew the samples. And such a person was not called as a witness to connect plaintiff's samples with the entries before the court. Consequently, the statement that exhibits 1 through 3 are *said* to be samples taken from entries before the court, without connection, does not establish the fact.

Moreover, in the case of the peppers covered by entry 110939 dated January 29, 1974 of protest 74–11–03241, plaintiff has introduced through Mr. Gonzalez samples which are likewise *said* to be taken from this entry and designated as exhibit 4. However, these samples, characterized by the witness as chilaca chilies, exhibit even a starker contrast in terms of size and shape when compared with exhibit C. A typical specimen from exhibit 4 measures ½ inch at its widest point, and 2¾ inches in length, is flat and, is colored dark red. Also, on the invoice the merchandise of this entry is not described as "chilaca" peppers, but is designated as "chile colorado." And no explanation has been offered by plaintiff to reconcile or explain the difference in terminology employed by the witness Gonzalez in relation to specimens in exhibit 4 and terminology contained in the invoice to describe the merchandise covered by this entry.

Further, although the witness Gonzalez testified that no regional confusion exists with respect to terminology employed in the chile

pepper industry to describe ancho and pasilla peppers, this testimony is not entirely supported by the record. In entries 116434, 116496, and 116497 covered by protest 74–8–02220 in which official samples were withdrawn upon entry, the merchandise was described on the invoices as "chile pasia" or "chile pasilla." However, in each instance the customs inspector noted on the invoices that the bags or sacks were marked "chile ancho."

The court finds the classification of the imported peppers as anchos is supported by the evidence in the record, and plaintiff has failed to present evidence to rebut that classification. The action must, therefore, be dismissed. Judgment will be entered accordingly.