HUTCHINSON BROKERS, INC., A/C THOS. P. GONZALEZ CORP., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 79-8-01298

Before RE, *Chief Judge.*

---

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(Decided November 23, 1981)

*Glad & White* (*Edward N. Glad* at the trial; *Steven B. Lehat* on the briefs) for the plaintiff.

*J. Paul McGrath*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Jerry P. Wiskin* at the trial and on the brief), for the defendant.

Re, *Chief Judge:* The question presented in this case pertains to the proper classification, for customs duty purposes, of certain dried, unground chili peppers imported from Mexico. The merchandise was described on the invoices as "Chili Seco Chilaca" peppers.

The chili peppers were classified by the customs officials as unground anaheim and ancho peppers pursuant to item 161. 80 of the Tariff Schedules of the United States. Consequently, they were assessed with duty at the rate of 5 cents per pound.

Plaintiff protests the classification and claims that the merchandise should have been properly classified as other capsicum or cayenne or red peppers, not ground, under item A161. 83 of the tariff schedules. If the imported chili peppers are properly classifiable under the claimed provision, they are entitled to be admitted free of duty by virtue of the Generalized System of Preferences.

The pertinent items of the tariff schedules provide as follows:

Schedule 1, Part 11, Subpart B, TSUS:
Pepper:

| * | * | * | * | * | * | * |

Capsicum or cayenne or red:
Not ground:

| 161. 80 | Anaheim and ancho_____ | 5¢ per lb. |

| * | * | * | * | * | * | * |

| A161. 83 | Other_____ | [Free] |

The record consists of the testimony of three witnesses, one called by plaintiff and two by defendant. It also contains twelve exhibits, seven introduced by plaintiff and five by defendant.

At the trial, the parties stipulated that the subject merchandise was not ancho peppers; that the requirements of the Generalized System of Preferences have been met; and that, in order to prevail, plaintiff need only prove that the merchandise is not anaheim peppers.

It was further stipulated that plaintiff's exhibit 6 is a correct translation of the first full paragraph of page 11 of plaintiff's exhibit 5, and that California and California Wonders are two different kinds of peppers.

Plaintiff contends that it has made a *prima facie* showing that the imported chili peppers do not fall within the common meaning, or commercial designation, of the term "anaheim" peppers, but are chilaca peppers, and, further, that defendant has failed to controvert plaintiff's evidence.

Defendant maintains that the chili peppers were properly classified as anaheim peppers, and that plaintiff has failed to establish any commercial designation for them.

As in all customs cases, plaintiff has the burden of overcoming the statutory presumption of correctness which attaches to the govern-

ment's classification pursuant to 28 U.S.C. § 2635 (1976). Thus, the question presented is whether plaintiff has borne its burden of proving that the imported chili peppers are other than "anaheim" peppers, as that term is used in item 161.80 of the tariff schedules.

Based upon a careful study of the record, and its assessment of the competency and credibility of the witnesses, the court has concluded that the presumption of correctness attaching to Customs' classification of the imported merchandise has not been rebutted. Plaintiff has not sustained its burden of proving that the classification by Customs was erroneous and that its claimed classification is correct.

It is apparent that the resolution of the issue requires a determination of the common meaning of "anaheim" peppers, as that term is used in item 161.80 of the tariff schedules.

It is fundamental that, in the absence of a special commercial designation, the language of a tariff statute is to be construed in accordance with its common meaning. Further, the common meaning of a word is a matter of law to be determined by the court, and, in making that determination, the court may rely upon its own understanding of the word or term used, and may consult standard lexicographic and scientific authorities. The testimony of witnesses respecting common meaning is advisory only and has no binding effect on the court. *Mattel, Inc.* v. *United States*, 65 Cust. Ct. 616, 619, C.D. 4147 (1970). See also, e.g., *United States* v. *O. Brager-Larsen*, 36 CCPA 1, 3, C.A.D. 388 (1948); *West Coast Cycle Supply Co.* v. *United States*, 66 Cust. Ct. 500, 503, C.D. 4242 (1971).

The evidence of record has been considered by the court in light of the foregoing legal principles.

The witnesses differ as to their respective backgrounds and experience.

Plaintiff's witness, Mr. Thomas P. Gonzalez, since 1954, was president of the Thomas P. Gonzalez Corp., the ultimate consignee. The firm imports and exports agricultural products, including twenty to thirty varieties of chili peppers. As president of the corporation, Mr. Gonzalez is responsible for all of its buying and selling. He has been buying chili peppers such as those at bar for almost fifty years. Mr. Gonzalez is frequently required to travel to Mexico where the various chili pepper varieties are grown. He has become familiar with the varieties of chili peppers by observing them being planted, grown, cultivated, harvested, dried and packed, selected, and cleaned and packed.

Defendant's witness, Dr. Roy M. Nakayama, is professor of horticulture at New Mexico State University. From that university he has a bachelor of science degree in agricultural botany, and a master's degree from Iowa State University in plant pathology.

He also holds a Ph. D. degree in plant breeding, horticulture, and plant pathology from Iowa State University. Dr. Nakayama has authored a number of research reports on the culture and identity of chili peppers, and is a member of the National Pepper Research Workers Group and the American Society for Horticultural Science.

Dr. Nakayama was employed by the California State Department of Agriculture for a period of two years where his primary responsibility was the observation of the planting of crops, including chili peppers, for disease investigations. His specialty encompasses chili pepper research, agricultural practices, chili variety development and identification, and consultation with industry and growers. His grower consultation relates to the culture and identity of different chili varieties. Dr. Nakayama also works with the New Mexico Crop Improvement Association to certify chili varieties as to true name. In the performance of his duties, he has traveled in the United States, some Central and South American countries, and various parts of Mexico. While in Mexico, he has oberved the planting of chili pepper seeds, and has consulted with farmers and others involved in the growing of chili peppers.

The conflicting testimony of the witnesses follows:

Mr. Gonzalez identified plaintiff's exhibits 1 and 2 as chili pepper samples taken from particular entries before the court. He was of the opinion that these samples are chilaca chili peppers. On the other hand, Dr. Nakayama pointed out that it is difficult to determine a chili variety without regional information because of the effect that this circumstance has on the size and shape of a particular variety. However, he stated that, based on texture and color, an identification could be made. Using this criteria, Dr. Nakayama testified that the chili pepper samples in plaintiff's exhibits 1 and 2 belong to the "Anaheim (California)" group of peppers.

In order to identify the particular variety of chili peppers, Mr. Gonzalez testified that one must consider shape, color, pungency, size and price. He stated, however, that the level of maturity of a chili pepper when it is picked will affect its color and size. He added that pungency encompasses both taste and odor, and that price is determined by the amount of color content and heat units which a given chili possesses, i.e., more color content and less heat units usually lead to a higher price.

Dr. Nakayama testified that the factors to be considered in identifying chili peppers include: shape; configuration; length; width; texture of the fresh pod, i.e., rough or indented; dried pod texture, i.e., smooth or wrinkled; and color of the dehydrated pod. Color may be affected by maturity and manner of storage, and storage is capable

of causing color deterioration. A very high dehydration temperature results in a darker than normal color for a given variety of chili peppers.

With respect to anaheim chili peppers, Mr, Gonzalez testified that their seed originated in Anaheim, California, and that most of them are grown in California, and a few in Mexico. He stated that the size of anaheim chili peppers, though variable, is generally the same; they do not vary considerably in shape; and their color ranges from bright red to dark, light, or medium, including reddish brown. Pungency in chili peppers is expressed in scovel heat units of which anaheim peppers have very few. The witness indicated, however, that pungency in itself is not a sufficient criterion for distinguishing between kinds of chili peppers.

In contrast, Dr. Nakayama testified that anaheim chilies are grown commercially in the United States, and in Mexico in the central part of Baja California, in Sonora State and in the northern part of Chihuahua State. He reaffirmed that anaheim chilies vary considerably in size, shape, and pungency depending upon the area where they are grown. He further testified that the terms "anaheim" and "California" are synonymous in the chili pepper industry; that he has grown anaheim chili peppers, and also what his seed supplier refers to as "Anaheim (California)." The witness stated that in the United States, the term "Anaheim (California)" chili encompasses a pepper which upon drying has a smooth surface with a red to reddish brown color range.

Plaintiff's exhibit 4 was identified as the frontispiece and pages 38 and 39 of a catalogue published by P.S. Petoseed, a commercial seed source, illustrating the anaheim and the college 64L chili peppers. In the opinion of Mr. Gonzalez, the college 64L pepper is the same as the chilaca, except that it is grown in the State of California rather than in Mexico. When asked on cross-examination whether or not he knew that the Petoseed company developed the college 64L pepper, he replied that he did not know who developed it. Also, when asked whether the college 64L pepper was derived from the anaheim pepper, the witness responded that "it could have, in criss-crossing." He added, however, that that circumstance alone would not make it a form of anaheim pepper.

According to Dr. Nakayama, the college 64L pepper was developed by the Petoseed company, and is a strain of the college 64 pepper. He was involved in the development of the college 64 pepper, and had observed the college 64L in its various plantings. He testified that both of these peppers belong to the "Anaheim, California" group of chili peppers. He did not know whether the college 64L and chilaca chilies were the same since he never heard the term "chilaca" used in

the United States or Mexico when referring to chili peppers. In Dr. Nakayama's opinion, if the chilaca pepper were known in the United States as a college 64L pepper, as testified by Mr. Gonzalez, then the chilaca pepper would fall into the anaheim group of chili peppers. He further stated that crossbreeding results in a new variety of chili, different from either parent in physical appearance.

As to the differences between anaheim and chilaca chilies, Mr. Gonzalez testified that they are similar in appearance but different in pungency, size, color, texture and price. He stated that the anaheim chili was larger in length, less pungent, smoother in texture, brighter red in color, and usually more expensive. He emphasized, however, that size, color, and pungency were the most significant differences between the two kinds of chilies.

Defendant's exhibit A was identified by Mr. Gonzalez as the contract of purchase for the merchandise at bar, together with the bank guarantee to the growers for the value of the chili peppers they were to ship. The merchandise is described in the purchase agreement as "Chile Seco Calidad F.R., Pasilla y California," and in the bank guarantee as "Chile Seco Variedades Pasilla y California de Calidad F.R." When asked what varieties of chili peppers are indicated in those documents, Mr. Gonzalez testified that they were pasilla and California chili peppers. In explaining the reference to California chilies in those documents, he stated that the Mexican farmer calls the chilaca chili by that name.

However, Dr. Nakayama testified that he has worked with California chili peppers, and that in the United States the anaheim chili pepper is referred to as a California type pepper. He added that, in regard to chili peppers, the terms "California" and "anaheim" are synonymous.

In an effort to support the testimony of its witness, plaintiff introduced into evidence certain publications. Plaintiff's exhibit 5 is a photocopy of publication No. 15 from the National Institute of Agricultural Investigations in Mexico, dated December 1966, and exhibit 6 is an authenticated translation of the first full paragraph of page 11 of that exhibit. According to this writing, chilaca is one of the principal types and varieties of chili cultivated in Mexico, and anaheim chili is one of the varieties introduced from the United States and now cultivated in Mexico. Plaintiff maintains that this affirms the testimony of Mr. Gonzalez with respect to the differences between anaheim and chilaca chili peppers in the United States market, and, further, that it coincides with the common usage of the term "anaheim" in this country. Consequently, plaintiff argues that the witness' identification of the imported merchandise as "chilaca," and not "anaheim,"

shows *prima facie* that the importations do not fall within the common meaning of the term "anaheim," but are "chilaca."

Plaintiff adds that Mr. Gonzalez' testimony as to the common meaning of "anaheim" versus "chilaca" chilies is further bolstered by exhibit 7, the New Mexico State University booklet entitled *Green Chili Recipe Fiesta*, which states that the anaheim variety of chili from California is mild. Plaintiff asserts that this statement confirms the testimony of its witness to that effect.

In its brief, plaintiff suggests that the testimony of Mr. Gonzalez as to anaheim pungency and growth in Mexico is supported by the *Sunset Mexican Cook Book* (13th printing, December 1973, Lane Books, Menlo Park, Calif.). As to pungency, it states that "the larger the chili the milder the flavor usually is," and "the flavor of California chilies ranges from mild and sweet like a bell pepper, to mildly hot." As to the area of cultivation of California (anaheim) peppers, it states: "These peppers are a variety cultivated principally in the United States and not often seen in Mexico, although very similar types called by several names are grown there." Hence, plaintiff argues that "those chilies which are merely similar do not fall within the common usage of the term Anaheim."

Plaintiff insists that, because of Mr. Gonzalez' long commercial experience in the buying and selling of chili peppers, his testimony should be accorded greater probative value than that of defendant's witness which is based upon scientific meaning which differs from common meaning. Finally, plaintiff submits that the record establishes that the merchandise at bar was invoiced as "Chili Seco Chilaca," and that it was personally sampled and identified by Mr. Gonzalez as being chilaca chili peppers. In this setting, plaintiff contends that it has made a *prima facie* showing that the common meaning of the term "anaheim" chilies does not embrace the imported merchandise.

Defendant emphasizes that inasmuch as Mr. Gonzalez is president of the plaintiff corporation he is an interested witness. Therefore, his testimony is not free from bias, and should be accorded considerably less weight than the testimony of Dr. Nakayama, who is an independent expert. Additionally, the defendant insists that the testimony of Mr. Gonzalez concerning several essential areas in controversy has damaged his entire credibility. In support of this contention, defendant points to the testimony of Mr. Gonzalez in connection with the Petoseed exhibit. It submits that, while it was introduced by plaintiff for the purpose of illustrating that the college 64L and the chilaca chili peppers are the same, as testified by its witness, an examination of the exhibit shows no reference at all to chilaca chilies. Furthermore, on cross-examination, Mr. Gonzalez

admitted that there is no reference in the exhibit that the college 64L pepper is called a chilaca. It is noteworthy that Dr. Nakayama testified that he developed the college 64 pepper, that the college 64L pepper is a strain of the college 64 pepper, and that the college 64L pepper was developed by the Petoseed company. Moreover, Dr. Nakayama testified that the college 64L pepper belongs to the "Anaheim, California" group of chili peppers.

An additional factor undermining the testimony of Mr. Gonzalez, asserts the defendant, is his unsatisfatory attempt to explain the conflict in the description of the imported merchandise on the invoices with that in the contract of purchase and the bank guarantee to the growers. As to this, defendant points to his testimony on cross-examination as follows:

"Q. Referring back to Exhibit A, Mr. Gonzalez, you testified this covers Pasillas and California. Would you tell the Court what the California is, in that exhibit?—A. Which exhibit?
Q. Exhibit A, your contract of purchase.—A. Well, California, in the State of Northern Lower California, the farmer calls the Chilaca chili, California, and he made the contract and then he invoiced on the base of California, or Chilaca."

Plaintiff failed to produce any evidence to support the explanation of its witness that the chilaca chili pepper is called "California" by the farmer. Moreover, this explanation was categorically refuted by Dr. Nakayama who testified that the terms "California" and "Anaheim" chili peppers are synonymous. Hence, the use of the words "chili * * * California" in the contract of purchase is clearly an admission against plaintiff's interest.

Defendant's exhibits B and C are bags of chili peppers consisting of official samples taken from entry Nos. 127253 and 127361 by Import Specialist Thomas T. Gallagher. These samples were bagged and marked by Mr. Gallagher, and kept in dry storage in Customs' sample locker in San Ysidro for almost a year. The pepper samples were not withdrawn from shipments that are before the court, nor are they representative of the imported merchandise in this action. Mr. Gallagher, called by the defendant as a witness, testified that at Customs he worked with the team that handled plaintiff's line of chili importations. He was familiar with the classification of peppers, and particularly those in defendant's exhibits B and C. He identified the merchandise in these exhibits as coming from shipments for the account of Thomas P. Gonzalez Corp., and testified that on the invoices they were described as "Chilaca," or Chilaca, field run." Although these chili peppers were invoiced as "Chilaca," or "Chilaca, field run," they were identified by Mr. Gonzalez as anaheim chili peppers.

In view of the above, defendant maintains it is apparent that plain-

tiff's witness was unable to discern any distinctions in the peppers in exhibits B and C which would enable him to identify them as chilaca chilies. Moreover, his testimony establishes that even if the imported chili peppers were known as chilaca chilies in Mexico, they would, nevertheless, be embraced by the term "anaheim," as set forth in item 161.80 of the tariff schedules.

Careful research reveals that the question presented appears to be of novel impression. It also discloses that there is a paucity of the usual tools or material which aid the court in understanding the nature and characteristics of the merchandise in issue, such as dictionaries, scientific authorities, and other reliable sources, including legislative history and background.

Turning to judicial enlightenment on the classification of dried, unground chili peppers, the court has found one prior judicial determination. While neither of the parties has relied upon the case in support of its position, several aspects, may, nevertheless, provide some guidance here. The case is *Rudolph Miles & Sons, Inc., a/c Thomas P. Gonzalez Corp.* v. *United States*, 79 Cust. Ct. 45, C.D. 4711 (1977), in which the testimony bearing on the issue in question was supplied by the same expert witnesses as in the present case, Mr. Gonzalez on behalf of the plaintiff, and Dr. Nakayama on behalf of the defendant.

In the *Rudolph Miles* case, the dried, unground chili peppers, exported from Mexico, were classified under TSUS item 161.80, the provision for "anaheim and ancho" peppers. The importer claimed that the imported merchandise was properly classifiable as "other" than anaheim and ancho peppers, under TSUS item 161.83. It was conceded by the parties that the merchandise in that case was not anaheim peppers. The question presented therefore was whether the imported peppers were "anchos," as contended by the government, or "pasillas," as claimed by the importer. The court observed that shape and size were admittedly dominant factors in the identification of varieties of chili peppers; that although the evidence in the record was conflicting for the most part, the parties did agree that the ancho variety of chili peppers is characterized by a wideness in body. Indeed, it is called "ancho" because of its shape, the term meaning "wide" in Spanish. The court found that the official samples from the imported peppers revealed a wideness in shape and size that was in conformity with the standard description for ancho peppers, whereas, samples presented by the importer and allegedly taken from the importations before the court revealed a narrowness in shape and size, in conformity with the standard description for pasilla peppers. Relying on the official samples, and the standard description as to size and configuration of the chili peppers contained in the evidentiary exhibits, the court held that the classification of the imported chilies as ancho peppers was

supported by the evidence, and that plaintiff failed to rebut the correctness of the classification.

It is clear from the foregoing that, in determining the correct identification of the variety of the controverted chili peppers, the physical examination of the samples by the court served not only to corroborate the testimony of the witnesses as to their size and configuration, but found support in the standard description of the ancho pepper as supplied by the evidentiary exhibits.

In the case at bar, the parties are not in agreement that the anaheim or chilaca chili pepper is characterized by a particular "wideness," or "narrowness," in body. Nor is it contended by either party that size and shape configuration are the dominant characteristics in the identification of the variety of chili peppers. Furthermore, the testimonial evidence reveals that Mr. Gonzalez testified that the level of maturity of a pepper when it is picked will affect its size. It was also stated by Dr. Nakayama that anaheim peppers vary considerably in size and shape depending upon the area in which they are grown, and that the variety of chili peppers is difficult to determine without regional information. Under these circumstances, it is apparent that without evidence of relationship with the foregoing factors, and none has been adduced by the parties, the samples contained in exhibits 1 and 2 are of little probative value in determining the asserted differences in size, color and pungency between the anaheim and chilaca chili peppers.

Worthy of particular note is the following dictum in *Rudolph Miles:*

"Moreover, in case of the peppers covered by entry 110939 dated January 29, 1974 of protest 74–11–03241, plaintiff has introduced through Mr. Gonzalez samples which are likewise *said* to be taken from this entry and designated as exhibit 4. However, these samples, characterized by the witness chilaca chilies, exhibit even a starker contrast in terms of size and shape whem compared with exhibit C. A typical specimen from exhibit 4 measures ½ inch at its widest point, and 2¾ inches in length, is flat and, is colored dark red." 79 Cust. Ct. at 49. Emphasis in original.)

This court has examined the samples in exhibits 1 and 2, characterized by Mr. Gonzalez as chilaca chilies, and has noted the physical differences between them and those characterized by Mr. Gonzalez as chilaca chilies in the *Rudolph Miles* case. The examination by the court in *Rudolph Miles* disclosed that a typical specimen from the samples characterized by Mr. Gonzalez as chilaca chilies measured ½ inch in diameter at its widest point, whereas a typical specimen of the chili peppers characterized by him as chilaca in exhibits 1 and 2, measures ½ inches or more in diameter at its widest point. These measurements show substantial differences in the size of imported chili peppers characterized by Mr. Gonzalez as chilaca. It is obvious that the weight

to be accorded to the testimony of plaintiff's witness, that the imported merchandise is chilaca and not anaheim chili peppers, has been seriously impaired.

Plaintiff maintains that in addition to the identification of the imported merchandise as chilaca chili peppers by Mr. Gonzalez, it was designated on the invoices as "Chili Seco Chilaca.

It is well settled that while the invoice description of imported goods may have evidentiary value, it does not finally fix the status, nature or character of an importation. *United States* v. *Rotberg & Krieger*, 24 CCPA 441, 445–46, T.D. 48902 (1937); *Hawley & Letzerich et al.* v. *United States*, 19 CCPA 47, 54, T.D. 44893 (1931); *Prosser* v. *United States*, 1 Cust. Ct. Appls. 29, 31, T.D. 30850 (1910); *The Mundo Corp. et al.* v. *United States*, 56 Cust. Ct. 303, 310, C.D. 2640 (1966). Furthermore, the record shows that the nomenclature on the invoices is at variance with that in the contract of purchase and the bank guarantee to the growers. Additionally, the record discloses that Mr. Gonzalez' explanation of this discrepancy is in direct conflict with that of Dr. Nakayama. Even apart from the question of credibility, it is evident that regional confusion exists with respect to the terminology employed in the chili pepper industry. Under these circumstances it is clear that the invoice description or designation is devoid of any probative value.

Plaintiff's reliance on the literature in evidence, to support the testimony of its witness as to the essential differences between the anaheim and chilaca chili peppers based upon pungency and country of origin, is misplaced. These factors, *per se*, are not germane to the determination of the issue presented, and, even if true, would not preclude the imported merchandise from inclusion within the common meaning of the term "anaheim."

The court does not agree with plaintiff's argument, in its brief, that exhibit 4, the Petoseed catalogue, illustrates the high degree of physical similarity between the anaheim and the college 64L chili peppers, and, therefore, corroborates Mr. Gonzalez' testimony that "the latter variety is synonymous with the chilaca chili grown in Mexico." Plaintiff suggests that implicit in this contention is the premise that, since it appears from the illustration that their differences are subtle, an accurate identification of the varieties of peppers requires the intimate familiarity uniquely possessed by Mr. Gonzalez. The fallacy with this argument is that an examination of pages 38 and 39 of the Petoseed catalogue, entitled *Standard-Peppers-Hot*, reveals that there is no reference in those pages to the chilaca chili pepper, either by illustration, description, or otherwise.

Beyond this, Dr. Nakayama testified that he is familiar with the college 64L chili pepper; that he has observed it in various field plant-

ings; that he has worked with it and knows it was developed by the Petoseed company. Furthermore, Dr. Nakayama stated that the college 64L pepper is considered a strain of the college 64 pepper which he developed, and that it belongs in the same category as the "Anaheim, California" chili.

The court does not agree with plaintiff's contentions on the classification of the imported merchandise, and gives credence to the testimony of Dr. Nakayama, the defendant's witness. Dr. Nakayama has demonstrated that he is well qualified to testify on the classification question presented, and that his testimony is authoritative, reliable, and credible. To overcome the presumption of correctness which attaches to the classification of the imported merchandise, and the opposing testimony and evidence of record, plaintiff has submitted the personal and self-serving opinion of its president, Mr. Gonzalez. Other than the unsupported personal opinion of Mr. Gonzalez, plaintiff has offered no testimony to establish that the imported merchandise is not embraced within the common meaning of the term "anaheim" as used in item 161.80 of the tariff schedules.

The defendant, on the other hand, did not merely rely upon the statutory presumption of correctness, but submitted competent, reliable and credible affirmative evidence, which the court has found persuasive, to support the presumption that the imported merchandise is within the common meaning of the term "anaheim" within item 161.80 of the tariff schedules.

Based upon a physical examination of the chili pepper samples exemplified in plaintiff's exhibits 1 and 2, Dr. Nakayama testified clearly that the imported merchandise belonged to the anaheim or California type or group of chili peppers. He also stated that the size, shape, pungency and color of chili peppers are peculiar to the area in which they are grown, and that they can vary considerably from area to area depending upon climatic and environmental conditions. Furthermore, although he has traveled in both Mexico and the United States, he has never heard the term "chilaca" applied to a variety of chili peppers.

Plaintiff, in its brief, urges that "should the court conclude that the common meaning of anaheim chilies encompasses the merchandise * * * it has presented evidence sufficient to establish a commercial meaning and such designation must take precedence." Plaintiff submits that the subject merchandise does not fall within the purview of the commercial designation for anaheim chili peppers.

Insofar as plaintiff claims a commercial designation for the term "anaheim" chilies, plaintiff has the burden of establishing that, as used in the trade at the time of the enactment of the tariff schedules, that term had a meaning which was general (extending over the entire

country), definite (certain of understanding), and uniform (the same everywhere in the country). *Moscahlades Bros., Inc.* v. *United States,* 42 CCPA 78, C.A.D. 575 (1954); *United States* v. *M. & D. Miller, Inc.,* 41 CCPA 226, C.A.D. 556 (1954); *Nylos Trading Co.* v. *United States,* 37 CCPA 71, C.A.D. 422 (1949). Thus, the rule of commercial designation "was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted." *Jas. Akeroyd & Co. et al.* v. *United States,* 15 Ct. Cust. Appls. 440, 443, T.D. 42641 (1928). See also *United States* v. *Fung Chong Co.,* 34 CCPA 40, 42, C.A.D. 342 (1946).

In support of its position, plaintiff points to the nationwide experience of Mr. Gonzalez in the buying and selling of chili peppers. It argues, therefore, that when he describes the distinctions between the anaheim and chilaca chili peppers, such description can be said to be general because of its wide circulation in commerce. Plaintiff also contends that the term "anaheim" has definite application as demonstrated by the specific illustrations and descriptive data in plaintiff's exhibit 4 and defendant's exhibit E, published by commercial seed companies. Finally, the plaintiff urges that the nationwide scope of the literature, and the testimony of its witness, "highlights a uniform understanding throughout the country."

Implicit in the rule of "commercial designation" is the premise that the trade understanding of the tariff term differs from the common meaning. Stated otherwise, the doctrine has no application where the commercial and common meanings are the same. *Stephen Rug Mills* v. *United States,* 32 CCPA 110, C.A.D. 293 (1944); *Draeger Shipping Co.* v. *United States,* 15 Ct. Cust. Appls. 190, T.D. 42234 (1927).

It is to be noted that plaintiff's posture concerning the issue of commercial meaning has been equivocal. Thus, in its complaint, and at the trial, plaintiff presented no claim or evidence of a commercial designation that differed from the common meaning of the term anaheim" chili peppers. However, in its post trial brief, plaintiff for the first time suggests the possibility that the commercial meaning of the term in issue is basically different from its common meaning.

Nevertheless, based on the present record, the plaintiff has failed to sustain its burden of establishing a commercial meaning different from the common meaning of the term "anaheim." With respect to proof of the fundamental elements of commercial designation, the record is almost entirely limited to the experience of Mr. Gonzalez in the buying and selling of chili peppers. Indeed, the pronounced differences, among other things, in the nomenclature, distinctions,

and characteristics of anaheim chili peppers, offered by both of the expert witnesses, demonstrate that there was no definite, general, and uniform trade understanding of that term. The record falls far short of establishing, by competent evidence, that the merchandise at bar is generally, uniformly and definitely recognized throughout the trade in this country by a commercial designation which would preclude its classification as anaheim peppers under item 161.80 of the tariff schedules.

For all the foregoing reasons, it is the determination of the court that the presumption of correctness attaching to the classification by Customs has not been overcome, and the action is dismissed.

Judgment will enter accordingly.